*In Re* Rafael Bosch, querellado.

Núm. 59.—*Sometido:* Mayo 1, 1945. *Resuelto:* Julio 6, 1945.

*Manuel Benítez Flores, Heriberto Torres Solá* y *R. Cuevas Zequeira,* abogados del querellado; *L. Morales Contreras, José Bosch Roqué, Rafael Arroyo Ríos, Gaspar Rivera Cestero, B. Sánchez Castaño* y *Félix Ochoteco, Jr.,* abogados del Colegio de Abogados de Puerto Rico, como *amicus curiae* éste; *R. A. Gómez, Fiscal del Tribunal Supremo,* abogado de El Pueblo.

El Juez Asociado Señor Snyder emitió la opinión del tribunal.

Ésta es una querella solicitando la separación de Rafael Bosch como miembro del foro de esta Corte por alegada conducta impropia. Examinaremos primeramente la contención del querellado de que esta Corte carece de jurisdicción para considerar este caso toda vez que él no está autorizado para ejercer la profesión de abogado en Puerto Rico.

■ Bosch nació en Puerto Rico en 1898 y vivió aquí hasta 1918. En 1917 y 1918 asistió al Colegio de Leyes de la Universidad de Puerto Rico. En 1918 se ausentó de Puerto Rico para completar su educación legal en los Estados Unidos continentales. Fué admitido al foro de Nueva York en 1923 y posteriormente fué admitido a ejercer la profesión en el Distrito de Columbia. En 1925 la Corte de Distrito de los Estados Unidos para Puerto Rico lo admitió a postular ante dicha corte, pero continuó ejerciendo principalmente en Nueva York.

Durante el 1934 Bosch estuvo en Puerto Rico como abogado de la N.R.A. El 21 de febrero de 1934 radicó una petición jurada ante este Tribunal solicitando se le admitiera al foro. Solicitó admisión sin examen de conformidad con la Ley núm. 78, Leyes de Puerto Rico, 1928 (pág. 533), basándose en su práctica anterior en Nueva York durante más de dos años y ante la Corte de Distrito de los Estados Unidos para Puerto Rico durante más de un año. Declaró bajo juramento que había practicado ante la Corte de Distrito de los Estados Unidos para Puerto Rico desde 1925 "en diferentes intervalos y especialmente en el año de 1928", y que era *vecino de San Juan*. Una vez cumplidos todos los requisitos de admisión, incluyendo el informe favorable de la Comisión de Reputación, declaramos con lugar la petición, prestando Bosch su juramento como miembro del foro de esta Corte el 15 de marzo de 1934. Poco después Bosch volvió a Nueva York, donde ha ejercido la profesión hasta la fecha. En verdad, nunca ha ejercido la profesión de abogado ante las cortes insulares de Puerto Rico.

Alega Bosch que no podemos desaforar a nadie que no esté autorizado a ejercer la profesión en Puerto Rico. Y alega que no está autorizado a ejercer la profesión aquí por la razón de que, si bien lo admitimos al foro en 1934, nunca se hizo miembro del Colegio de Abogados de Puerto Rico. Descansa principalmente en la sección 3 de la Ley núm. 43,

Leyes de Puerto Rico, 1931–32, pág. 523, que lee como sigue: "Celebrada la primera junta general del Colegio, ninguna persona que no sea miembro del mismo podrá ejercer la profesión de abogado en esta Isla".

La admisión al ejercicio de la abogacía es función inherente a esta Corte; la legislación aprobada sobre esta materia es puramente directiva, no mandatoria para esta Corte. *Ex Parte Jiménez,* 55 D.P.R. 54; *Guerrero* v. *Tribunal de Apelación de Contribuciones de Puerto Rico,* 60 D.P.R. 241; *People* v. *Goodman,* 8 N.E.2d 941 (Ill., 1937). Es cierto que hemos aplicado la Ley núm. 43—que en muchas de sus disposiciones sigue las leyes estatales que proveen un *forc* integral—hasta el punto de que a solicitud del Colegio hemos separado de la práctica a miembros de nuestro foro que han dejado de pagar las cuotas anuales del Colegio señaladas en la sección 9 y por tanto han sido separados como miembros del Colegio de conformidad con la sección 10. *Colegio de Abogados de Puerto Rico* v. *Fajardo,* 51 D.P.R. 528. De igual manera, hemos reinstalado a tales abogados después de pagar sus cuotas atrasadas. Pero no puede inferirse de dichos casos que hemos cedido al Colegio el control de los miembros de nuestro foro. En verdad, la Ley núm. 43 de su faz niega tal contención. La sección 4 dispone que "Serán miembros del Colegio todos los abogados que estén admitidos a postular ante el Tribunal Supremo de Puerto Rico y cumplan los deberes que esta ley les señala".

Hemos aceptado la Ley núm. 43 como legislación satisfactoria para ayudar a esta Corte en la reglamentación de admisiones al foro y de la conducta de sus miembros. Pero los pasos decisivos para la obtención de la admisión a nuestro foro son nuestra resolución declarando con lugar la solicitud de admisión y la prestación del correspondiente juramento. Cumplidos estos requisitos, según lo reconoce la sección 4, el pago de las cuotas y el desempeño de cualesquiera otros deberes exigidos por la Ley núm. 43 son pasos

mecánicos que, de realizarse por una persona ya admitida a ejercer la profesión, automáticamente le dan derecho a pertenecer al Colegio de Abogados. Si bien es cierto que para poder gozar del privilegio que le conferimos a un abogado para ejercer en nuestras cortes también debe pertenecer al Colegio, dicha organización carece de discreción para rehusar su admisión, a la que le da derecho su juramento ante esta Corte.

Las controversias pasadas entre Bosch y la Junta de Gobierno del Colegio en relación con su admisión al Colegio nada tienen que ver con este caso. Si hubiera sometido a esta Corte dichas controversias, hubiéramos ordenado a la Junta de Gobierno que lo admitiera como miembro del Colegio, siempre y cuando que cumpliera con la Ley núm. 43. Y en seguida hubiéramos zanjado la disputa en cuanto a si Bosch tenía que pagar ciertas cuotas por años anteriores para que el Colegio lo admitiera, según alegaba la Junta de Gobierno.

Por tanto no podemos convenir con Bosch de que bajo las circunstancias aquí envueltas carecemos de jurisdicción para disciplinarlo por conducta impropia. Puede admitirse que no podía ejercer la profesión en Puerto Rico a menos que perteneciera al Colegio. Pero éste era un requisito puramente formal y rutinario que podía cumplir en cualquier momento; su privilegio a ejercer emana de su juramento ante nos, y no de su matrícula en el Colegio. Una vez que preste juramento como funcionario de esta Corte, puede en cualquier momento ser llamado a responder por su conducta profesional para poder determinar esta Corte si nuestra resolución admitiéndolo debe dejarse sin efecto. En verdad, resolver lo contrario equivaldría a permitir a cualquier abogado local amenazado con tal procedimiento, simplemente que deje de pagar sus cuotas como miembro del Colegio. Esto lo separaría de su matrícula, y entonces podría negar

nuestra jurisdicción para castigarlo por el fundamento de que no era un miembro del Colegio.

Es cierto que este caso es único en su género en varios aspectos. Toda vez que Bosch nunca se hizo miembro del Colegio, de hecho nunca se dedicó a la práctica de su profesión en las cortes insulares de Puerto Rico. Y los actos impropios que se le imputan tuvieron efecto, como veremos, en el Distrito de Columbia y en Nueva York. Convenimos que hubiera sido por tanto más deseable si se hubieran dilucidado los cargos que se le imputan en las jurisdicciones en que se cometieron. Pero no nos incumbe la razón por la cual no se hizo esto. Una vez traído el caso a nuestra atención, no podemos eludir nuestro deber porque este procedimiento hubiera podido radicarse con más propiedad en otra jurisdicción. Aquí sólo nos concierne nuestra jurisdicción. Y Bosch admite, y la jurisprudencia sostiene, que un abogado que ejerce su profesión en una jurisdicción puede ser castigado por conducta impropia ocurrida fuera de ella. Véanse *In re Porep,* 111 P.2d 533 (Nev., 1941); *Geibel* v. *State Bar of California,* 79 P.2d 1073 (Calif., 1938); *Richmond Ass'n of Credit Men* v. *Bar Ass'n,* 189 S. E. 153 (Va., 1937); *Barnes* v. *District Court,* 173 Pac. 1100 (Calif., 1918); *In re Craig,* 82 P.2d 442 (Calif., 1938).(1)

El hecho de que Bosch era un miembro del foro de Nueva York con anterioridad a su admisión a nuestro foro, de que nunca ejerció en Puerto Rico con excepción de su práctica ante la Corte de Distrito de los Estados Unidos, y que se ausentó de Puerto Rico después de haberse admitido a nuestro foro para volver a ejercer su profesión en Nueva York, la que ha ejercido allí hasta la fecha, no tiene el efecto de privarnos de jurisdicción en este caso. El hecho de pertenecer al foro de más de un estado no es desconocido en ésta

---

(1)Bosch alega que dichos casos no son de aplicación debido a que nunca ha ejercido la profesión aquí. Creemos que se aplican de igual manera a una persona que está autorizada a practicar en esta jurisdicción no obstante nunca haber optado por hacer uso de este privilegio.

254

y otras jurisdicciones. Y mientras cualquier miembro de nuestro foro continúe siendo un funcionario de esta Corte, es nuestro deber examinar su conducta prescindiendo del sitio donde cometió la falta, cuando su conducta es cuestionada en el procedimiento adecuado ante nos.

Otra impugnación a nuestra jurisdicción no exige extensa consideración. El 16 de junio de 1944 el Presidente de los Estados Unidos sometió al Senado de los Estados Unidos la nominación de Bosch para el cargo de Juez Asociado de este Tribunal. Estando pendiente ante el Senado dicha nominación, el 6 de noviembre de 1944, el Fiscal de esta Corte radicó la querella en este caso. Bosch afirma que el considerar nosotros la querella bajo tales circunstancias constituye una violación de la doctrina constitucional de la separación de poderes. Su tesis consiste en que al así actuar estamos invadiendo la función constitucional del Senado de confirmar nominaciones presidenciales.

No estamos de acuerdo. En primer lugar, la nominación de Bosch ya no está ante el Senado debido a que éste no tomó acción alguna sobre la misma antes de que el Septuagésimo Octavo Congreso levantara sus sesiones *sine die* a fines de 1944 y en vista de que el Presidente desde dicha fecha no ha hecho una nueva nominación de Bosch o de cualquiera otra persona. Además, con todo el respeto debido, creemos que es nuestro deber bajo la Carta Orgánica([2]) no ceder a nadie, incluyendo al Senado de los Estados Unidos, la función de determinar si un miembro de nuestro foro es culpable de conducta profesional impropia que justifique medidas disciplinarias de este Tribunal. En verdad, la misma doctrina constitucional de separación de poderes invocada por Bosch es la base de nuestra conclusión de que este procedimiento de separación del foro no puede ser afectado por cualquier asunto que pudiera estar pendiente en el Senado. Es innecesario añadir que cualquier acción que tomemos tam-

---

([2])Véase *Banco Popular* v. *Corte de Distrito,* 63 D.P.R. 66.

poco puede afectar al Senado en el desempeño de sus pre-
rrogativas constitucionales.(³)

■ Esta querella le imputa a Bosch conducta impropia,
como abogado y notario público de Nueva York, en relación
con divorcios mejicanos obtenidos por Bosch para Modesto
Soler y otras personas. Estos cargos se entenderán mejor
si preliminarmente hacemos una relación de hechos.

Soler nació en Puerto Rico. Al igual que cientos de mi-
les de otros puertorriqueños, se trasladó a la ciudad de
Nueva York donde ha estado domiciliado desde 1938. En
1943 pertenecía a las fuerzas armadas como recluta, acan-
tonado en un campamento en Tennessee donde Ettienne Fra-
ticelli, otro puertorriqueño y compañero de armas de Soler,
que había emigrado también a Nueva York hacía un número
de años, también estaba acantonado. Fraticelli y Bosch se
criaron en el mismo pueblo en Puerto Rico, y eran amigos
hacía varios años.

Durante 1943 Bosch, como abogado en ejercicio en Nueva
York, estaba tramitando para Fraticelli un caso de divorcio.
En 27 de septiembre de 1943, Fraticelli le escribió a Bosch
que Soler deseaba también que Bosch lo divorciara toda vez
que su esposa en Puerto Rico había dado a luz dos hijos de
otros hombres. Bosch le escribió a Soler el 29 de septiembre
diciéndole que tenía suficiente causa para divorciarse y que
él podía obtenerle el divorcio si Soler le contestaba ciertas
preguntas en cuanto a sus testigos, su residencia, la direc-
ción exacta de su esposa y si él pensaba casarse otra vez.
El 2 de octubre, Soler le contestó que vino a la ciudad de

---

(³)Lo que hemos dicho—y lo que nos proponemos decir en el resto de esta
opinión—no puede y no debe interpretarse como que pretende influir sobre el
Presidente o sobre el Senado en el nombramiento de la persona que ocupará la
vacante existente en esta Corte. No es muy halagador el hecho de tener que
examinar la conducta de un abogado a quien el Presidente Roosevelt nombró
para dicha vacante. Pero al cumplir con este penoso deber hacemos hincapié
en el hecho de que estamos considerando la querella que pende ante nos, y nada
más. Cualquier otro proceder de parte nuestra sería tan presuntuoso como
impropio.

Nueva York en 1938; que ha vivido allí desde dicha fecha; que ahora vive con sus tíos en cierta dirección en Nueva York; que la dirección exacta de su esposa era Playa Naguabo, Puerto Rico; y que pensaba casarse con una muchacha en Nueva York.

Bosch contestó el 5 de octubre al efecto de que podía divorciarse en Nueva York siguiendo el mismo procedimiento empleado en el caso de Fraticelli, a un costo de $250. Le decía que radicaría la demanda inmediatamente al recibir el primer plazo de sus honorarios. El 7 de octubre Soler contestó esta carta dándole a Bosch cierta información adicional. También le decía "Según he entendido usted va a poner la demanda o mejor dicho lo va a publicar en el periódico, pues así es que yo quiero que sea, pues yo no quiero que ella sepa nada de esto." También le preguntaba que si "Me podría casar yo mientras me esté divorciando o tengo que esperar que esté completamente divorciado. Le pregunto porque yo no sé mucho de las leyes de aquí." También le decía que no tenía dinero allí pero que le enviaría $100 tan pronto se los mandaran sus padres de Puerto Rico.

Sin esperar contestación a esta carta, Fraticelli, aparentemente a instancias de Soler, le escribió a Bosch el 11 de octubre indicándole que los honorarios de Bosch podrían pagarse con más facilidad después que Soler se volviera a casar. Esta carta contenía la oración "las ideas de él es de casarse ahora cuando vaya de *furlough*". Bosch le contestó a Fraticelli acusándole recibo de su carta de 11 de octubre y de la carta de Soler del 7 de octubre. La carta de Bosch, fechada el 13 de octubre, decía en parte como sigue:

"En cuanto a tu amigo él me escribió y me dijo que él quería casarse cuanto antes posible. Me preguntó si se podía casar mientras estuviera pendiente el juicio de divorcio. Mi contestación es la siguiente: No se puede casar mientras esté pendiente el divorcio, y es más, la ley prohibe que se

case hasta haber transcurrido el plazo de tres meses después de la fecha de sentencia de divorcio.

"Ante esta situación si le urge grandemente casarse entonces, lo que debe hacer él es divorciarse en Méjico donde el divorcio se tardaría de seis semanas a dos meses y sobre todo no tendría que esperar más pues se podría casar tan pronto tuviera su sentencia. El costo sería el mismo pero es mucho más fácil pues lo único que tendría él que hacer sería firmar un documento que yo le enviaría y no hay que citar a la demandada. La citación se hace allá por edictos que se publican en el periódico de la localidad en Méjico donde se pide el divorcio.

"Si él quiere hacer esto que me lo notifique y yo prepararé los documentos de modo que los firme en seguida y podemos esperar hasta que reciba los cien pesos de Puerto Rico pero me tendría que adelantar la suma de $25 para comenzar. Contra recibo de ellos prepararé los documentos y se los remitiré en seguida." Esta carta tiene una postdata que dice: "En caso que quiera proceder sin pérdida de tiempo envío el documento que él debe firmar y devolverme a esta dirección".

El documento adjunto era un poder que autorizaba a un tal Moisés Garza Ramos, un abogado residente en la ciudad de Juárez,. Estado de Chihuahua, República de Méjico, para que compareciera ante cualquier autoridad judicial competente de dicho Estado y entablase demanda de divorcio por Soler contra su esposa por las causales de separación de más de un año e incompatibilidad de caracteres. Este poder autorizaba a Garza a someter a Soler a la jurisdicción de la referida corte mejicana a los fines de obtener el divorcio. El poder decía que el único hijo nacido en el matrimonio estaba en Puerto Rico, pero no contenía dirección alguna de la esposa o del menor. También estaba redactado para otorgarse y jurarse ante Bosch, como notario público del Con-

dado de Queens, el 13 de octubre de 1943, en la Ciudad y Condado de Nueva York, Nueva York.

Cuando Soler recibió de Fraticelli el poder, lo firmó en el campamento en Tennessee en fecha posterior al 13 de octubre, y se lo devolvió a Bosch. El 19 de octubre Soler le escribió a Bosch en contestación a la carta de éste a Fraticelli del 13 de octubre. En esta carta le decía: "Recibí su carta de ayer lunes, la cual le contesto seguido para decirle que estoy de acuerdo que Ud. haga el divorcio como Ud. dice, o sea en México. Según usted dice allá lo pueden hacer en seis semanas, o dos meses. Yo le mando cuarenta y cinco pesos ($45) ahora para que usted haga lo que usted pueda. Luego le mandaré el resto de los cien pesos y trataré de pagarle todo su dinero lo más pronto posible que pueda".

Después de recibir el poder enviádole por correo, Bosch lo firmó en Washington como notario de Nueva York y por carta del 21 de octubre se lo envió a Garza diciéndole que le enviaría el certificado de matrimonio y el certificado de nacimiento del hijo tan pronto como se recibieran de Puerto Rico. Aun cuando Bosch sabía por la carta de 2 de octubre que Soler le escribió que la esposa residía en la Playa de Naguabo, Puerto Rico, su carta a su corresponsal guarda silencio en cuanto al paradero de la esposa. Tampoco contiene instrucciones o comentario alguno en cuanto a la manera de emplazar a la esposa demandada.

Se admite por Bosch que las leyes de Méjico exigen que dicho poder debe otorgarse y jurarse ante un notario. También admite que la ley de divorcio de Chihuahua autoriza el emplazamiento del demandado por edictos solamente en casos en que el domicilio del demandado se ignore, bajo pena de nulidad de lo actuado si durante el juicio se justifica que, al iniciarse la acción, el actor conocía el domicilio del demandado; y Bosch admite en su contestación que él sabía

que ésta era la ley de Chihuahua durante el período de tiempo comprendido en estos acontecimientos.

Fraticelli le escribió a Bosch el 26 de octubre preguntando si Bosch había recibido el dinero de Soler y que si Bosch iba a proceder de acuerdo con las leyes de Méjico o con las de Nueva York. Bosch entonces le escribió a Soler el 28 de octubre diciéndole que había recibido la carta de Fraticelli y los $45, y que "Como Ud. debe saber el asunto se lo presenté ya en México, pues inmediatamente que recibí el poder que firmó Ud. lo remití a mi colega en México . . .". Soler acusó recibo de esta carta el 3 de noviembre, enviándole $25 más y preguntándole por ulteriores acontecimientos.

El 18 de febrero de 1944 Bosch le escribió a Soler diciéndole que la sentencia de divorcio se había dictado y que había recibido dos copias de la misma de su corresponsal, las que enviaría a Soler cuando éste le pagara el balance de sus honorarios. El expediente en el procedimiento de divorcio demuestra que Garza, alegando que el domicilio de la esposa se ignoraba, emplazó a ésta por edictos en Chihuahua y obtuvo una sentencia en rebeldía sin que se presentara prueba por las partes, ninguna de las cuales estuvo presente ni residió jamás en Méjico.

Soler no contestó inmediatamente a Bosch porque Soler había llevado su asunto al Oficial de Ayuda Legal del campamento, quien le escribió a Bosch. Soler finalmente le escribió a Bosch el 25 de marzo diciéndole que consideraba el asunto terminado, toda vez que el oficial de ayuda legal le había dicho que el divorcio mejicano no era válido. Esto terminó la correspondencia entre Soler y Bosch. Soler nunca le envió a Bosch el balance de sus honorarios y Bosch nunca le envió a Soler la sentencia del divorcio mejicano.

*Cargos 1 y 2*—Pasemos a los primeros dos cargos, que consideraremos conjuntamente. Como hemos visto, Bosch certificó como notario que Soler el 13 de octubre de 1943, en la Ciudad y Condado de Nueva York, en su presencia,

había otorgado y jurado el poder que autorizaba a Garza a obtener un divorcio mejicano para Soler. El cargo es que Bosch no conocía a Soler personalmente para esa época, y que no conocía su firma; que el poder de hecho fué preparado por Bosch y enviado por correo a Soler en Tennessee con instrucciones de que lo firmara y lo devolviera; que Soler lo firmó en Tennessee fuera de la presencia de Bosch en una fecha posterior al 13 de octubre; y que Bosch certificó que el poder fué otorgado ante él como notario en Nueva York, el 13 de octubre a sabiendas de que esto era falso.

En su contestación Bosch admite los hechos en cuanto a estos cargos, con la excepción de que alega que él conocía la firma de Soler a través de la correspondencia sostenida por él, y que el poder de hecho fué firmado por Soler y fué posteriormente usado a los fines para los cuales se otorgó. Alega también que no tuvo intención criminal de defraudar, y que no violó ley alguna de Nueva York o de cualquier otra jurisdicción.

Las cortes de Nueva York se han confrontado en el pasado con situaciones similares. En el caso de *Matter of Barnard,* 151 App. Div. 580 (1912), un abogado que era notario certificó que ciertos documentos fueron autenticados ante él en Nueva York como notario cuando lo cierto fué que él se los envió al deponente en Washington, firmándolos éste en Washington y devolviéndoselos por correo al abogado que entonces estampó su firma en los mismos. Al resolver un procedimiento disciplinario instituído contra este abogado por la referida conducta impropia, la Corte calificó esta falta como "una muy seria." Dice que (pág. 583) "Es difícil comprender cómo un abogado del prestigio, posición y educación del querellado pueda ser culpable de una falta como ésta, y nunca podríamos ser lo suficientemente severos al censurar su conducta". Sin embargo, en vista del hecho de que el querellado francamente admitió su falta, y de que se cometió sin intención de defraudar a nadie, y que las fir-

mas autenticadas eran genuinas, limitó el castigo a la censura, pero hizo la advertencia (pág. 583) "que, después de expresar nuestras conclusiones, de cometerse nuevamente esta falta, consideraremos nuestro deber actuar más rigurosamente."(4)

En el caso de *Matter of Napolis,* 169 App. Div. 469 (1915), un abogado que también era notario llamó al deponente por teléfono, reconoció su voz, jurando éste el affidavit por teléfono y entonces estampó su firma y título oficial al juramento. La corte dijo a la pág. 471: "No aparece que este affidavit fué hecho con la intención de usarse en cualquier procedimiento judicial o legal y, hasta donde se desprende, no se usó de esta manera. Desde luego, tal método de autenticar un juramento es enteramente ilegal y no está autorizado, y el querellado actuando como lo hizo fué culpable de *misdemeanor,* pero también ha sometido una contestación completa y franca a este cargo, ha admitido la falta y no ha tratado de exonerarse mediante declaraciones falsas o por una negativa de cualquiera de los hechos imputádosle. La falta es seria y la condenamos severamente. Es inconcebible que un miembro del foro olvide de tal manera su deber a la profesión y al público como faltando a su deber e infringiendo la ley penal". En ese caso la corte también impuso el castigo de censura.(5)

(1)En *People* v. *Reiter,* 273 N.Y. 348 (1937), la Corte de Apelaciones de Nueva York, citando el caso de *Matter of Barnard,* resolvió que tal conducta constituye un *misdemeanor* bajo el inciso 2 del Art. 1820-a de la Ley Penal de Nueva York, que dice como sigue: "Un notario público o comisionado de escritura que en el ejercicio de sus facultades o en el ejercicio de sus deberes propios de tal cargo lleve a cabo cualquier fraude o engaño, cuyo castigo no se provea en alguna otra forma en esta Ley, será culpable de *misdemeanor*".

(5)Otros casos de Nueva York citados por el Colegio de Abogados que comparece aquí como *amicus curiae,* en los cuales se impuso el castigo más severo de la separación permanente de la profesión, envolvían fraude, perjurio u otra conducta impropia en adición a la de una autenticación falsa. *Matter of Gotthein.* 153 App. Div. 779 (1912); *Matter of Sprung,* 229 App. Div. 501 (1930); *Matter of the Application of the Brooklyn Bar Association,* 225 App. Div. 680 (1928).

En vista de estos casos, es obvio que a lo menos debemos censurar severamente a Bosch.([6])  Y quizá estaríamos dispuestos a adoptar este método de castigo por los primeros dos cargos si, como en dichos casos, Bosch francamente hubiera admitido su conducta impropia.  Pero esto no es lo ocurrido en su caso.

La defensa de Bosch consiste en que después de haber recibido la carta de Fraticelli de 11 de octubre en cuanto a que Soler iba a Nueva York con licencia, el 12 de octubre Bosch fué del Distrito de Columbia, donde pasaba la mayor parte de su tiempo, a su oficina en Nueva York a despachar éste y otros asuntos; que preparó el poder, de fecha 13 de octubre, y esperó a Soler en su oficina durante el día 13 con el fin de que firmara y jurara el poder; y que cuando Soler no apareció, Bosch le incluyó el poder a Fraticelli en su carta de 13 de octubre, según indica la posdata de la misma, para que Soler lo firmara y se lo devolviera.

Bosch afirma que debido al mucho trabajo ya que solamente estaba permaneciendo un día en Nueva York, se le "olvidó" que a Fraticelli no le fué posible encontrar un notario en el campamento cuando Bosch le había enviado la querella para que la jurara en su propio pleito de divorcio en Nueva York, y que también se le "olvidó" advertirle a Soler que jurara el poder ante un oficial del Ejército.  De la misma manera se le "olvidó", según dice, advertirle a Soler que si no encontraba un notario, se podía radicar en Méjico una demanda sin jurar firmada por Soler.

Bosch indica—y el testimonio demuestra que es verdad— que cuando Soler recibió el poder, Soler lo firmó y lo devolvió a instancias de Fraticelli, a pesar del hecho de que

([6])Bosch alega que él no cometió delito alguno en Nueva York toda vez que la falsa autenticación fué hecha en el Distrito de Columbia.  Ésta es una contención frívola.  Éste es un procedimiento para desaforar a un abogado, no un procedimiento criminal.  Véase *In Re Tormes*, 30 D.P.R. 267.  En verdad, este proceder, a nuestros fines, agrava la falta al actuar Bosch como un notario de Nueva York en el Distrito de Columbia.

aparentaba que se juraría ante Bosch, porque Fraticelli había sido aconsejado anteriormente por Bosch, una vez que Fraticelli le había informado a Bosch que no se encontraba un notario en el campamento, que podía firmar sin juramento su demanda de divorcio que iba a ser radicada en Nueva York.[7]

Bosch había incluído un sobre con dirección para ser usado por Soler al devolverle éste a Nueva York el poder firmado. Soler envió el poder a Nueva York, siéndole enviado desde Nueva York a Bosch en Washington. Bosch afirma que cuando lo recibió en Washington, estaba trabajando día y noche en su carácter de abogado del Subcomité del Comité del Senado sobre Territorios y Asuntos Insulares y que "aun cuando no recuerdo con exactitud lo ocurrido, puedo declarar que debo haber puesto mi firma al referido poder y haberlo remitido a mi corresponsal de Juárez, Chihuahua, en uno de esos momentos en que mi mente debía haber estado completamente agotada . . .".[8]

No podemos dar crédito a varias partes importantes de esta historia de Bosch que creemos es una explicación tardía. En primer lugar, no podemos creer que Bosch interpretara la alusión casual contenida en la carta de 11 de octubre de Fraticelli a Bosch—"las ideas de él es de casarse ahora cuando vaya de *furlough*"—como queriendo decir que Soler ya estaba a bordo del tren de Tennessee a Nueva York y que se encontraría con Bosch en su oficina de Nueva York el 13 de octubre para firmar el poder. En la carta no se mencionó fecha de partida o de llegada, y nada se dijo sobre

[7] Bosch le escribió a Fraticelli el 5 de octubre de 1943 simplemente para que firmara la demanda en el divorcio en Nueva York ya que el juramento no era indispensable. La objeción del Fiscal a la admisión en evidencia de esta carta se declara sin lugar.

[8] Esta cita se toma del *affidavit* de Bosch radicado en este caso. No practicamos prueba en corte abierta toda vez que las partes firmaron una estipulación sometiendo el caso por los *exhibits* y *affidavits*. Los *exhibits* incluyen una transcripción del testimonio aducido en las vistas del Comité de lo Judicial del Senado en cuanto a la nominación de Bosch como Juez Asociado de esta Corte.

venir a Nueva York con el fin de ver a Bosch; más aún Fraticelli claramente indicó que Soler iba a obtener una licencia con el fin de casarse en Nueva York, y no simplemente para jurar un poder a ser usado en un divorcio que se tomaría luego dos meses más para obtenerse.

Según indica Bosch, una querella firmada pero no jurada, o la autenticación del poder por un oficial del Ejército, eran otras soluciones obvias. El porqué Bosch no eligió usarlas no nos incumbe.(⁹) El hecho es que prefirió usar un poder, que exigía juramento bajo la ley mejicana, según Bosch lo sabía. Sin embargo, nos pide que creamos que él esperaba que Soler usará su licencia, que esperaba obtener cuando se pudiera volver a casar, para venir a Nueva York desde un campamento en Tennessee simplemente para jurar el poder. A la luz de estas circunstancias, no podemos aceptar la manifestación de Bosch de que fué a Nueva York creyendo que Soler se vería con él en su oficina en 13 de octubre, y que por tanto preparó el poder en anticipación de la llegada de Soler para jurarlo.

El hecho es que en dicha misma fecha, 13 de octubre, Bosch, como hemos visto, le escribió a Fraticelli—con un membrete indicativo de que la carta se escribía en el Edificio de Oficinas del Senado en Washington y no en Nueva York—enviándole el poder para que Soler lo firmara. Bosch no dice nada en esa carta en cuanto a la alegada omisión de Soler de comparecer en su oficina de Nueva York o nada indica en modo alguno al efecto de que lo había estado esperando. Tampoco le explica a estos legos de poca instrucción cómo un poder que se contempló se juraría ante él como notario en Nueva York podía ser otorgado válidamente en Tennessee por el otorgante fuera de su presencia. Su igno-

---

(⁹)No podemos comprender cómo puede Bosch afirmar que debido al exceso de trabajo se le ''olvidó'' informarle a Soler que podía jurar el poder adjunto ante un oficial del Ejército en caso de no conseguir un notario, cuando el poder, preparado por Bosch, dice en el texto que se otorga y se jura ante Bosch en Nueva York.

rancia al dejar de distinguir entre la demanda no jurada en el caso de Fraticelli en Nueva York y el poder en el caso de Soler en Méjico puede explicar la acción de Soler al firmar este último. Pero ciertamente esto no justifica la conducta impropia de Bosch como notario.

De igual modo, no nos impresiona la defensa de que Bosch firmó el poder estando excesivamente ocupado y que por tanto no sabía lo que hacía. Éste no es el caso de uno que en un momento de abstracción firma un papel junto a muchos otros puestos para su firma. El poder fué preparado por el mismo Bosch para ser otorgado y jurado por uno de sus clientes. Bosch había tramitado un número de esos casos; sabía que bajo la ley mejicana tenía que jurarse. También sabía, tanto de su práctica como de sus artículos, que en jurisdicciones de derecho civil como Méjico no solamente se le confiere a tales juramentos un alto grado de solemnidad si que también el notario, lejos de realizar sencillamente la función rutinaria de juramentar las partes, tiene el deber de redactar el documento, certificar en cuanto a su validez y explicar su contenido a los otorgantes. En verdad, Bosch muy correctamente cumplió con estos requisitos del derecho civil diciendo en el último párrafo del poder que ''Leí este instrumento al otorgante advertido de su derecho de leerlo de por sí al cual renunció, y advertido de su valor y fuerza legales por la explicación que de él le hice, se ratificó en su contenido y firma conmigo el Notario en unidad de acto; de todo lo cual yo el Notario doy fe''.

Bosch escribió la carta del 13 de octubre ordenando que el poder fuera sencillamente *firmado* por Soler en Tennessee. Soler lo firmó y se lo envió por correo a Bosch. Bosch completó el documento mientras estaba en Washington firmándolo allá como notario de Nueva York y añadiendo de su propio puño y letra ''Queens County, New York, Commission Expires Mar. 30, 1944.'' Entonces le envió el poder a su corresponsal de Méjico el 21 de octubre acompañado de una

carta. Así vemos que en todas las etapas de estas actuaciones, que culminaron en la radicación del poder ante la corte mejicana, Bosch tiene forzosamente que haberse dado cuenta que estaba haciendo una falsa autenticación de un poder que iba a usarse a nombre de su cliente en un procedimiento judicial. Sin embargo, pretende hacernos creer que entre 13 y 21 de octubre, mientras realizaba todos estos actos que requieren el ejercicio de criterio y habilidad legal en su redacción, estaba tan abrumado de trabajo en el desempeño de sus funciones en su cargo del Senado que no se daba cuenta de lo que hacía—que todo esto sucedió en efecto en un momento de aberración temporal.

Sentimos encontrar la explicación de Bosch poco convincente. Por el contrario, estamos satisfechos por la evidencia de que, no obstante el hecho de que Bosch pudo haber seguido el procedimiento simple y legal de preparar o bien una demanda que exigía la firma pero no el juramento, o un poder con una disposición para que un oficial del Ejército tomara el juramento,([10]) deliberadamente Bosch prefirió evitarse tener que tomar uno de estos dos métodos haciendo un juramento falso en violación de la ley. Como otros en casos similares, aparentemente creyó que la autenticación de la firma era una formalidad trivial que podía hacerse por correo sin riesgo alguno de que se averiguara.

Los hechos aquí envueltos no son tan favorables a Bosch como aquéllos que se encuentran en los casos de *Napolis* y *Barnard*. En dichos casos, si bien los notarios impropiamente autenticaron las firmas estampadas fuera de su presencia, personalmente conocían a los deponentes y sus firmas. Pero cuando Bosch certificó la autenticación del poder, nunca había visto a Soler. Sus únicas relaciones anteriores con Soler fueron dos cartas que parecían ser de So-

([10]) Quizá esto hubiera sido un poco más difícil toda vez que los notarios en los Estados Unidos continentales no están acostumbrados a cumplir con los elaborados requisitos de los países de derecho civil en cuanto al otorgamiento de documentos públicos.

ler. El hecho de que la firma en el poder luego resultara ser genuina, puede atribuirse a buena suerte, y no a precaución alguna tomada por Bosch. En verdad, en un esfuerzo por robustecer su historia de que no sabía lo que hacía cuando autenticó el poder, Bosch testificó ante el Comité Judicial del Senado que ni siquiera comparó la firma del poder con las de las cartas.

Además, como hemos visto, ésta no era una autenticación rutinaria hecha por un notario bajo la práctica familiar en los Estados Unidos continentales donde los notarios por lo general son legos. Éste era un documento preparado por Bosch a nombre de un cliente en la forma exigida para ser usado en una jurisdicción de derecho civil donde las funciones del notario, como muy bien sabía Bosch, tienen un concepto legal muy importante aparte del acto ministerial envuelto al tomar el juramento. *Cf. In re Rivera*, 64 D.P.R. 633. Y en el caso de *Napolis* la corte señaló como circunstancia atenuante que, contrario al caso de autos, el affidavit falso envuelto allí no se otorgó para ser usado en un procedimiento judicial y no se usó con este fin.

Sin embargo, a pesar de estas circunstancias agravantes, en vista del hecho de que la firma de Soler en el poder resultó de hecho genuina, y que quizá no se causó daño alguno por la autenticación falsa,(11) estaríamos constreñidos a seguir la pauta de las cortes de Nueva York y limitar nuestro castigo en cuanto a los cargos relacionados con la autenticación falsa a severa censura si Bosch, como ocurrió en dichos casos, francamente hubiera admitido su error. Pero al tratar de justificar su conducta pasada, Bosch ha agravado su falta mediante su testimonio bajo juramento, parte del cual estamos obligados a rechazar como no merecedora de

---

(11)*Cf. In re Arjona*, 40 D.P.R. 109. No estamos preparados para decir, a pesar del argumento del Fiscal a ese efecto, que el procedimiento en el divorcio mejicano era enteramente nulo *como cuestión de derecho mejicano* porque el poder no fué autenticado debidamente. Para decidir este procedimiento es innecesario resolver esta complicada cuestión de derecho mejicano.

crédito. Teniendo esto en mente, pospondremos la determinación final en cuanto al castigo hasta que hayamos considerado los otros cargos,

■ *Cargo 3*—Este cargo consiste en que a pesar de que Bosch sabía que la ley de divorcio de Chihuahua autoriza el emplazamiento del demandado por edictos solamente en caso de que el domicilio del demandado se ignore, bajo pena de nulidad si durante el juicio se justifica que, al iniciarse éste, el actor conocía el domicilio del demandado, Bosch como abogado de Soler instruyó a Garza, su corresponsal, que radicara en la corte correspondiente en Juárez, Chihuahua, un pleito de divorcio por Soler contra su esposa, y que emplazara a ésta por edictos, instrucciones que llevó a cabo Garza; y que Bosch llevó a efecto esta acción a pesar de los hechos (1) que había sido informado por Soler que el domicilio de la demandada era Naguabo, Puerto Rico, y (2) que sabía que para poder emplazar a la demandada por edictos su corresponsal venía obligado a alegar, como alegó, que el domicilio de la demandada se ignoraba. Termina el cargo alegando que por razón de la referida conducta Bosch engañó a dicho tribunal y obtuvo con ello una sentencia de divorcio en rebeldía.

La principal defensa de Bosch ahora es que delegó en Garza la determinación de la forma del emplazamiento, y que Garza optó por emplazar a la esposa de Soler por edictos sin que Bosch lo instruyera a ese efecto. Puede ser cierto que corrientemente un abogado de Nueva York que le envía un caso a un abogado de Méjico tenga derecho a descansar en el criterio de su corresponsal en cuanto a requisitos locales de procedimiento tales como la manera adecuada de emplazar. Pero esta declaración general no presenta el cuadro completo en este caso.

Una gran parte del ejercicio de Bosch en Nueva York consistía en asesorar en cuanto al derecho civil de países Latino Americanos. Como consecuencia natural de su expe-

riencia en este ramo, fué contratado durante un período de años por varios residentes de Nueva York para que les obtuviera divorcios mejicanos. Garza, que era el corresponsal de Bosch en Juárez durante un número de años para este fin, radicó 12 de tales casos para clientes de Bosch en una corte de Juárez durante el año pasado, incluyendo el caso de Soler y otros casos de divorcio aquí envueltos. Con motivo de esta raigambre de familiaridad con el derecho civil de varios países Latino Americanos y particularmente su experiencia en obtener divorcios mejicanos, Bosch estaba bien enterado, como él mismo admite en su contestación, que la ley de divorcio de Chihuahua autoriza el emplazamiento del demandado por edictos solamente si el domicilio de éste se ignora.

A pesar de su conocimiento de esta disposición de la ley mejicana y a pesar del hecho de que el 2 de octubre, contestando el requerimiento de Bosch para que le enviara información sobre el asunto, Soler le había escrito a Bosch que su esposa residía en cierto sitio en el pueblo de Naguabo, Puerto Rico, encontramos a Bosch, antes de que le enviara este caso a su corresponsal mejicano, escribiendo a Fraticelli el 13 de octubre para que se comunicara con Soler al efecto de que para obtener un divorcio mejicano para Soler "El costo sería el mismo, pero es mucho más fácil pues lo único que tendría él que hacer sería firmar un documento que yo le enviaría y no hay que citar a la demandada. La citación se hace allá por edictos que se publican en el periódico de la localidad en Méjico donde se pide el divorcio." Y esta afirmación del emplazamiento por edictos se torna más significativa cuando se recuerda que Soler el 7 de octubre le había escrito a Bosch que él quería que se emplazara a su esposa por edictos "pues yo no quiero que ella sepa nada de esto". La promesa hallada en la carta de Bosch de 13 de octubre de que el emplazamiento sería por edictos en Méjico escasamente da la impresión de que Bosch

se proponía dejar en manos de su corresponsal la decisión en cuanto al medio de hacer el emplazamiento.

Y como en el caso de la autenticación falsa, aquí también encontramos a Bosch demostrando una falta de franqueza. Nos dice en efecto que la carta del 13 de octubre no significa lo que la misma dice. Su argumento es que las referencias al emplazamiento por edictos en su correspondencia con Soler nada tenían que ver con un divorcio mejicano, sino que eran meramente para asegurarle a Soler que su caso era idéntico al de Fraticelli en el sentido de que como domiciliado en Nueva York también podía obtener un divorcio en Nueva York emplazando por edictos a su esposa que estaba en Puerto Rico. Ésta es una explicación que Bosch ha extraído del hecho de que cuando Soler se comunicó primeramente con él, Soler aparentemente había visto una carta de Bosch a Fraticelli sugiriéndole un divorcio para Fraticelli bajo dicha fórmula y expresó un deseo de usarla en su propio caso.([12]) Pero cuando Soler luego le escribió a Bosch que quería casarse inmediatamente, Bosch tomó la iniciativa y sugirió en su lugar un divorcio mejicano en su carta de 13 de octubre. Y en esa misma carta Bosch describe en lenguaje inequívoco las ventajas de un divorcio mejicano, incluyendo el emplazamiento por edictos en Méjico—un medio de emplazamiento en el cual Soler había demostrado tener interés. En verdad seríamos cándidos si, a la luz de esta correspondencia, creyéramos que Bosch ya no le había asegurado a Soler que el emplazamiento a su esposa se haría por edictos en Méjico.

Bosch no presentó cartas o cualquiera otra evidencia tendente a demostrar que él le dejó a su corresponsal la elec-

---

([12])El plan original para emplazar a la esposa de Fraticelli por edictos en Nueva York se abandonó posteriormente y ella fué emplazada personalmente en Puerto Rico con la demanda de Nueva York. Pero aun si el emplazamiento se hubiera llevado a cabo por edictos en Nueva York, la ley de dicho estado hubiera exigido que se le enviara una copia de la demanda a la esposa en Puerto Rico. Y Soler quería que se emplazara por edictos sin nunca dejar que su esposa se enterara.

ción en cuanto a la manera de emplazar en el caso de Soler o en cualquier otro caso. Nos pide que encontremos esto en su *ipse dixit*.([13]) Pero la manera en que se ventiló el caso de Soler y el hecho de que en prácticamente todos los otros casos enviados por Bosch a Garza el emplazamiento se llevó a cabo, como en el caso de Soler, también por edictos más bien hace creer que Bosch tenía cierta clase de arreglo con Garza por el cual se haría el emplazamiento por edictos en los casos en que Bosch así lo deseara. En verdad, en el caso de Soler, cuando Bosch le envió el asunto a Garza, éste procedió sin más a emplazar por edictos.

Sin embargo, si examináramos la conducta de Bosch en el caso de Soler asumiendo, como Bosch afirma, que él invariablemente le dejó a su corresponsal la elección en cuanto a la manera de emplazar, estamos obligados a concluir que Bosch fué negligente en su deber para su cliente. Para que Garza ejercitara su criterio inteligente y efectivamente sobre esta cuestión, era imperativo que Bosch le enviara toda la información que tuviera en cuanto al paradero de là demandada. Sin embargo, encontramos a Bosch—el que fuera premeditadamente o por negligencia es impertinente a nuestro propósito—dejando de informar a Garza que la demandada residía en Naguabo, Puerto Rico. Por el contrario, simplemente le mandó a Garza el poder,([14]) el certificado de matrimonio de

([13])Bosch introdujo en evidencia opiniones de algunos abogados de Juárez de que su conducta ni era criminal ni impropia bajo las leyes de Chihuahua. Sin embargo, estas mismas opiniones indican, a pesar de su manifestación aquí en contrario, que al solicitar estas opiniones Bosch le informó a estos abogados que en algunos casos Bosch instruyó a Garza que hiciera el emplazamiento por edictos.

Bosch también alega que la disposición en el poder de Soler de que Garza siga " . . . todos los trámites requeridos hasta obtener sentencia . . . " es evidencia de su política de dejarle a Garza la determinación de la forma del emplazamiento. No podemos convenir en que esta disposición general tenga tal efecto, particularmente a la luz de todas las otras circunstancias concurrentes.

([14])Bosch alega que el poder le dió a Garza, por lo menos indirectamente, información en cuanto al paradero de la esposa, toda vez que en él Soler "declara que contrajo matrimonio civil con la señora Margarita Robles, natural de Puerto Rico, el día 4 de noviembre de 1938 y asimismo declara que de dicho matrimonio

Soler con la demandada, y el certificado de nacimiento de su hijo, de ninguno de los cuales se desprendía el domicilio actual de la esposa demandada. Y su carta guarda silencio en cuanto a la forma del emplazamiento, aunque sabía muy bien que bajo el derecho mejicano la forma del emplazamiento dependía del conocimiento que tuviera el demandante del paradero de la demandada.

El asunto por tanto se reduce a esto: Bosch alega que no puede culpársele por el emplazamiento defectuoso porque él le dejó tales gestiones a su corresponsal local. Pero al dejar de enviar la información que él tenía en su poder en cuanto al actual domicilio de la demandada, Bosch o estaba decidiendo tácitamente por sí mismo que el emplazamiento se hiciera por edictos sobre el cual ya le había dado seguridades a su cliente, o estaba privando a su corresponsal de información esencial para la decisión de éste en cuanto al emplazamiento. Bajo cualquier teoría su conducta es reprobable.(¹⁵)

No nos concierne el que Garza actuara correctamente como abogado mejicano al no inquirir específicamente de Bosch en cuanto al paradero de la demandada antes de alegar que se ignoraba su domicilio. Tampoco creemos propio determinar en este caso si, como alega el Fiscal, la sentencia de divorcio es nula de acuerdo con el derecho mejicano con motivo de conocer el demandante y Bosch el domicilio

hubo un solo hijo nacido el 17 de julio de 1939 y se llama Gualberto, en Villa Naguabo, Puerto Rico. Además declara que no tienen propiedad alguna que pertenezca a la sociedad conyugal y que dicho hijo se encuentra en la Isla de Puerto Rico''. No podemos convenir que al decir en el poder que Soler estaba casado con una dama puertorriqueña, que su único hijo nació cuatro años antes en Naguabo y que el hijo se encuentra en algún punto en Puerto Rico, se cumplió con el deber de Bosch de suministrarle a su corresponsal mejicano la dirección actual exacta en Puerto Rico de la esposa, que Bosch conocía.

(¹⁵) Un senador expuso la controversia exacta ahora ante nos durante la vista celebrada por el Comité de lo Judicial al manifestar: '' . . . todavía estamos juzgando a este caballero sobre si cumplió o no, como debe cumplir un buen abogado, con el deber de hacer lo que es necesariamente imperativo en casos de esta clase—informarle a su corresponsal en Méjico en cuanto a la residencia de la demandada de manera que se pudiera efectuar un emplazamiento válido.''

de la demandada cuando Garza, para obtener una resolución de la corte autorizando el emplazamiento por edictos, alegó a nombre del demandante que el domicilio de la demandada se ignoraba; o si, como arguye Bosch, bajo la Ley de Amparo mejicana la demandada a lo sumo tenía derecho a solicitar en una corte mejicana la nulidad de la sentencia de divorcio dentro de 15 días después de ella tener conocimiento de la misma y que como ella no ha hecho esto, Soler ahora posee un divorcio válido por lo menos bajo el derecho mejicano, independientemente de cualquier supuesto defecto en el emplazamiento original de la demandada.

Para resolver el cargo ante nos, sólo tenemos que exponer nuestra conclusión de que ocultando la información que él poseía en cuanto al paradero de la demandada, ciertamente Bosch arriesgó la validez del divorcio que él le estaba tramitando a Soler, aun como cuestión de derecho mejicano. Según él mismo dice, la esposa lo pudo haber anulado mediante el correspondiente procedimiento en Méjico si hubiera así elegido. Escasamente podemos permitirle a Bosch que se refugie en la fortuita circunstancia de que la esposa, después de tener conocimiento por otras fuentes del divorcio mejicano, optara por hacer caso omiso de todo el procedimiento mejicano y procediera luego a obtener un divorcio contra Soler en Puerto Rico, divorcio que aparentemente Bosch admite que es válido.

No nos incumbe resolver si Bosch engañó o no a la corte mejicana. Bosch ha presentado en evidencia opiniones de algunos abogados de Juárez que lo exoneran de toda culpa a ese respecto. Pero esta cuestión jurisdiccional surge en un procedimiento de divorcio, no en un pleito en cobro de pagaré. Quizá nada tiene un efecto más profundo en una persona que vive en una comunidad civilizada que su *status* matrimonial. Y el estado, por virtud de las relaciones familiares que emanan del matrimonio, tiene un interés igualmente grande en el status matrimonial de sus domiciliarios.

Pospondremos temporalmente la consideración del punto de si una corte mejicana podría en cualquier momento adquirir jurisdicción del asunto envuelto en un procedimiento de divorcio entre dos personas no residentes. Aun suponiendo que pudiera, la jurisdicción tiene que obtenerse sobre las personas envueltas. Y tal jurisdicción podría atacarse, aun en Méjico, si el demandante obtuviera una resolución autorizando el emplazamiento por edictos mediante la alegación falsa de que ignora el paradero de la demandada. Por tanto no vemos a qué fin práctico conduciría el aventurarnos a contestar el problema esotérico de si la conducta de Bosch sería considerada impropia por una corte mejicana. Con todos los hechos aquí expuestos a la vista, basta exponer nuestra conclusión que al ocultar la información que tenía en su poder en cuanto a la residencia de la demandada en el caso de Soler, la conducta profesional de Bosch fué manifiestamente impropia.

■■ *Cargo 4*—Aquí el Fiscal imputa el hecho de que teniendo conocimiento de lo improcedente del mismo, Bosch se avino a los deseos de su cliente Modesto Soler a tramitar el pleito de divorcio sin darle conocimiento del mismo a la esposa con el deliberado propósito de privarle de la oportunidad de defenderse. El cargo es que esto se llevó a efecto emplazando a la esposa por edictos, ya que Bosch sabía que si no se hacía el emplazamiento por edictos, bajo la ley de divorcio de Chihuahua el emplazamiento tenía que hacerse bajo las leyes de Puerto Rico.

Es obvio de la discusión del tercer cargo que Bosch es culpable de este cargo. En vez de rechazar inmediatamente la solicitud de su cliente, Bosch entró en la estratagema y ocultó el paradero de la demandada con el fin de que el reprochable deseo de Soler de obtener un divorcio sin informar a su esposa pudiera llevarse a cabo.

Bosch sabía que si le informaba a su corresponsal que la esposa de Soler estaba domiciliada en la Playa de

Naguabo, Puerto Rico, el corresponsal hubiera tenido, de acuerdo con la ley mejicana, que emplazarla de conformidad con las leyes de Puerto Rico. Para evitarse esta contingencia, Bosch no le envió a su corresponsal información en cuanto al domicilió de la esposa. Esto inevitablemente resultó en el emplazamiento por edictos, y la concesión de un divorcio del cual la esposa no tenía conocimiento.

Es difícil concebir una violación más crasa de los elementos del debido procedimiento y de justicia que este sórdido episodio. Quizá Soler no se dió cuenta de las consecuencias de su conducta. Bosch no puede interponer tal defensa.

*Cargo 5*—Este cargo puede reducirse a lo siguiente: Bosch recibió de Soler $115 para tramitar un divorcio válido contra su esposa. Pero nunca se consiguió tal divorcio válido porque la referida corte mejicana, que el propio Bosch seleccionó, nunca tuvo jurisdicción sobre la demandada por dos razones: (1) la demandada fué emplazada por edictos, a pesar del hecho de que Bosch y el demandante sabían su domicilio; y (2) ninguna de las partes tenía residencia o domicilio en Méjico. A pesar de estos hechos, y a pesar del hecho de que el propio Bosch ha admitido que el referido divorcio no es válido, Bosch no ha devuelto la referida suma de dinero a Soler.

La defensa de Bosch a este cargo es que toda vez que Soler estaba ansioso de volverse a casar en seguida, Bosch sugirió que él podría obtener un divorcio para Soler en Méjico; y que Soler, por conversaciones que tuvo con Fraticelli y por la lectura de las cartas de Bosch a Fraticelli, había recibido el consejo de Bosch que éste siempre da en tales casos, que es como sigue: el divorcio mejicano sería nulo y no sería reconocido en las cortes de Nueva York; no se podía usar para afectar los derechos de su primera esposa e hijo, o en materia de herencia; y que el divorcio no tendría fin práctico excepto que le daría derecho a Soler a casarse nueva-

mente en Chihuahua lo que podía hacerse por poder sin riesgo alguno de que se le acusara de bigamia.

Echamos a un lado la contención del Fiscal de que Bosch le cobró a Soler $115 los cuales no le ha devuelto. En verdad, Bosch dice ahora sin contradicción que él recientemente le devolvió este dinero a Soler en vista del hecho de que la esposa de éste ha obtenido un divorcio en una corte de distrito de Puerto Rico. De igual manera, como ya indicamos en la discusión del cargo anterior, no determinaremos si el emplazamiento defectuoso trajo como consecuencia la nulidad del divorcio como cuestión de derecho mejicano. Por el contrario pasamos al aspecto más grave del cargo; es decir, que a pesar de que Bosch sabía que el divorcio mejicano no iba a ser reconocido por las cortes de los Estados Unidos, persuadió a Soler que aceptara un divorcio mejicano en vez de uno de Nueva York sin advertirle que el primero sería nulo.

Bosch admite que el divorcio mejicano es nulo. En verdad, difícilmente podía asumir otra posición. Méjico no era el domicilio de la esposa demandada; y toda vez que ella no fué emplazada debidamente ni compareció en el procedimiento, la corte mejicana no tenía jurisdicción sobre su persona. *Williams* v. *North Carolina,* 317 U. S. 287, 298-9. Véanse *Yarborough* v. *Yarborough,* 290 U. S. 202; *Davis* v. *Davis,* 305 U. S. 32. *Cf. Milliken* v. *Meyer,* 311 U. S. 457.

Pero hay un defecto más serio en esta sentencia de divorcio—la corte mejicana no tenía jurisdicción sobre el asunto envuelto en el pleito. "Bajo nuestro sistema de ley, el poder judicial para decretar un divorcio—la jurisdicción, estrictamente hablando—está fundado en el domicilio." *Williams et al.* v. *North Carolina,___*U. S.___, resuelto el 21 de mayo de 1945, página 3 de la opinión. Aquéllos que buscan divorcios fuera de sus estados domiciliarios lo hacen en la esperanza de que la cláusula del pleno reconocimiento de la Constitución prohibirá investigación independiente por

sus estados domiciliarios sobre. el hecho jurisdiccional de domicilio en el estado donde se tramite el divorcio. Sólo bajo tal teoría pueden ser completamente efectivos sus divorcios de turista obtenidos después de una temporada de seis semanas en Nevada y en otros estados con cortos requisitos de residencia y con causales de divorcio elásticas. Estas esperanzas sufrieron un rudo golpe por la resolución en el segundo caso de *Williams*. Pero Bosch admite que los divorcios mejicanos aquí envueltos, que no estaban fundados en residencia alguna en Méjico, no le proporcionaban a los que los obtenían aun la más leve esperanza de validez—por ilusoria y mal fundada que en definitiva resultó ser—la que, antes del segundo caso de *Williams,* se le daba a los turistas divorciados. Esto es así porque las autoridades en los Estados Unidos siempre han sido unánimes—de los cientos de casos sobre esta cuestión no sabemos de uno en contrario— que la jurisdicción sobre el asunto envuelto en un caso de divorcio descansa en el domicilio, o por lo menos en la residencia *animo manendi,* de por lo menos una de las partes en los divorcios. Véanse casos coleccionados en las anotanes, 143 A.L.R. 1294; 105 A.L.R. 817.

También creemos propio indicar que el primer caso de *Williams*—resuelto varios meses antes de que Soler se pusiera en comunicación con Bosch en 1943 y que atrajo general atención, particularmente entre los abogados quienes como Bosch se dedicaban a esta clase de práctica—no le presta gran ayuda a Bosch. Si bien por el primer caso de *Williams* "el requisito jurisdiccional del domicilio es liberado de los refinamientos confusos en cuanto a 'domicilio matrimonial' ",[16] aun allí el demandante tuvo que probar que por lo menos él estaba domiciliado en el sitio donde se entabló el divorcio, no importa cuán breve pudiera ser el período de residencia sobre el cual se basaba su domicilio. Pero aquí tenemos un divorcio aerodinámico tramitado por

---

[16] *Williams et al.* v. *North Carolina,* supra, opinión pág. 3.

correspondencia; ninguna de las partes residió en o visitó nunca a Méjico, ni compareció personalmente en el procedimiento.([17])

Y finalmente hasta dónde las cortes de Nueva York, que es el estado domiciliario de Soler, han ido al negarse a reconocer un divorcio mejicano, se desprende del caso de *Querze* v. *Querze*, 290 N. Y. 13, resuelto en marzo de 1943.([18]) Allí, a pesar del hecho de que ambas partes, domiciliadas en Nueva York, intentaron someterse a la jurisdicción de una corte mejicana y consintieron en que se dictara una sentencia de divorcio, la sentencia mejicana de divorcio fué declarada nula. Y aun la esposa, que había obtenido el divorcio, no fué impedida de radicar un pleito de divorcio en Nueva York, no obstante el marido haberse vuelto a casar con otra mujer. La Corte de Apelaciones dijo a la pág. 17: ''Los hechos en el presente caso son de tal naturaleza que las cortes de este Estado no pueden reconocer validez a la sentencia mejicana de divorcio (*Vose* v. *Vose*, 289 N.Y. 779). *Nadie cuestiona la nulidad de la sentencia mejicana.* Esta corte ha resuelto que una sentencia extranjera de divorcio que sea nula impedirá al cónyuge que la obtenga establecer en nuestras cortes una reclamación privada proveniente del matrimonio (*Starbuck* v. *Starbuck*, 173 N. Y. 503; *Hynes* v. *Title Guarantee & Trust Co.*, 273 N. Y. 612). Pero hemos resuelto consistentemente que tal sentencia no tendrá efecto

---

([17]) La cláusula de pleno reconocimiento no se extiende a sentencias de países extranjeros. El reconocimiento de tal divorcio, por tanto, podía resultar solamente si un Estado o Territorio de los Estados Unidos eligiera hacerlo empleando los principios indefinidos y flexibles de la deferencia. Esto podría suceder solamente si el divorcio fuera concedido de acuerdo con sus propias nociones de política. Y la jurisprudencia unánimemente rehusa reconocer por deferencia un divorcio de un país extranjero en el cual ninguna de las partes vivió alguna vez, a pesar de que las leyes de tal país extranjero no haga de la residencia o domicilio una condición para que la corte de dicho país adquiera jurisdicción. Véanse casos en 105 A.L.R. a las páginas 822–24; 143 A.L.R. a la página 1313.

([18]) Bosch, un abogado neoyorquino que tenía durante 1943 pendiente el caso de Soler y varios otros divorcios mejicanos, difícilmente puede alegar el desconocimiento de esta decisión.

sobre el derecho de cualquier cónyuge a una plena adjudicación en nuestras cortes de la cuestión del status matrimonial existente (*Stevens* v. *Stevens*, 273 N.Y. 157; *Davis* v. *Davis*, 279 N. Y. 657; *Vose* v. *Vose*, supra; *Maloney* v. *Maloney*, 288 N. Y. 532)." (Bastardillas nuestras).([19])

Al examinar las anteriores autoridades no estamos emulando a Don Quijote arremetiendo los molinos. No obstante la admisión de Bosch de que el divorcio mejicano que él obtuvo para Soler era nulo, es inportante ver cuán inservible es al compararse con lo que Bosch le dijo a Soler que le iba a conseguir.

En manera alguna estamos seguros de que la clase de consejo que Bosch dice le dió a Soler y a otras personas es digna de los miembros de nuestro foro. Tampoco estamos tan seguros como Bosch—él dice que la proposición es tan elemental que es innecesario citar autoridades en su apoyo —de que un matrimonio por poder en Méjico inmediatamente después de un divorcio mejicano por correspondencia impediría la persecución criminal de Soler en Nueva York o en cualquier otro sitio por vivir con su segunda "esposa". En el segundo caso de *Williams* los divorciados en Nevada que aún tomaron más precauciones—se casaron personalmente en Nevada—sufrieron una gran decepción: nada los consolaría el hecho de que mientras cumplen sus sentencias en la penitenciaría, su delito sea llamado convivencia bígama en Carolina del Norte en vez de bigamia. No nos detenemos a examinar las leyes de otros estados, incluyendo Nueva York, que indudablemente contienen suficientes recursos para imponer sanciones penales contra tal flagrante menosprecio de sus domiciliarios contra los convencionalismos de la comunidad en que residen—si todo lo demás resulta infructuoso, la mayor parte de los estados, incluyendo a Nueva York, indudablemente todavía hacen del adulterio un delito.

---

([19]) Véanse también las secciones 111, 112, *Restatement, Conflict of Laws; Cohen* v. *Randall*, 137 F.2d 441 (C.C.A. 2d, 1943); Harper, *The Validity of Void Divorces*, 79 U. of Pa. L. Rev. 158, 166, 182.

Pero soslayaremos estas cuestiones. Lo que es importante a nuestros fines es determinar qué clase de consejo de hecho le dió Bosch a Soler.

Como hemos visto, Bosch afirma que él le aconsejó a Soler—y a todos sus otros clientes que serían divorciados en Méjico en el futuro—que su divorcio sería nulo y no tenía fin práctico excepto el de protegerlo contra una acusación por bigamia una vez vuelto a casar, matrimonio que debería realizarse por poder en Méjico. Ésta es una declaración sorprendente en vista del récord ante nos.

Soler, descubriendo que Bosch estaba tramitando un divorcio para Fraticelli en Nueva York, se puso en contacto con Bosch, pidiéndole que le consiguiera un divorcio para él en Nueva York. Le dijo que estaba domiciliado en Nueva York, y que quería casarse con una muchacha en Nueva York. Le preguntó en su carta de 7 de octubre si él se podía volver a casar mientras se le divorciaba. Soler no le había escrito nada a Bosch sobre el divorcio mejicano. Bosch por su propia cuenta le sugirió el divorcio mejicano. En su carta de 13 de octubre le aconsejó a Soler que no se podía casar hasta tres meses después de decretado el divorcio de Nueva York. Entonces siguió diciéndole que si quería volverse a casar inmediatamente "lo que debe hacer él es divorciarse en Méjico, donde el divorcio se tardaría de seis semanas a dos meses, y sobre todo no tendría que esperar más pues se podría casar tan pronto tuviera su sentencia.. El costo sería el mismo pero es mucho más fácil pues lo único que tendría él que hacer sería firmar un documento que yo le enviaría y no hay que citar a la demandada. La citación se hace allá por edictos que se publican en el periódico de la localidad en Méjico donde se pide el divorcio." Soler aceptó este consejo y el divorcio mejicano fué obtenido.

Así vemos que, lejos de agotar todos los recursos disponibles para obtener un divorcio en Nueva York, que Bosch dice era su práctica invariable, y lejos de advertirle a Soler

el inútil divorcio que conseguiría de Méjico, Bosch disuadió a Soler de su propósito de divorciarse en Nueva York y sugirió en cambio un divorcio en Méjico. Y le pintó un cuadro muy atrayente: en seis semanas se obtendría un divorcio al mismo costo; se podría casar inmediatamente; su esposa nunca se enteraría—que era lo que Soler ardientemente deseaba—toda vez que el emplazamiento se haría en Méjico por edictos. Ni una palabra en cuanto a la nulidad del divorcio—es más, ni una palabra de precaución en cuanto a casarse por poder en Chihuahua en vez de ir a Nueva York con licencia para casarse, como Soler había planeado.

Debe tenerse en cuenta que Soler no era un hombre corrido de mundo que comprendía las implicaciones de un divorcio mejicano y lo deseaba solamente porque en ciertos círculos tenía ese divorcio un indicio de respetabilidad. Aquí tenemos un recluta casi analfabeto a quien Bosch, de manera cruel y desalmada, le hizo creer que un divorcio mejicano sería válido y le permitiría casarse otra vez en Nueva York sin que tuviera repercusión alguna antes de que fuera enviado allende los mares a pelear por su país. Solamente mediante la intervención afortunada de un Oficial Jurídico del Ejército pudo este joven evitar un desastre, y sus lazos matrimoniales fueron finalmente rotos mediante un divorcio obtenido por su esposa, quien siempre ha residido en Puerto Rico. Pero Bosch difícilmente puede reclamar crédito por este feliz desenlace.

La explicación que Bosch ofrece de toda esta correspondencia es increíblemente débil. Una vez más trata de persuadirnos de que el lenguaje claro no significa lo que dice. En efecto, pretende que hagamos caso omiso de estas cartas. Por el contrario nos pide que creamos que en agosto, 1943 la joven con quien Fraticelli intentaba casarse si podía obtener un divorcio, vino a ver a Bosch en Nueva York a instancias de Fraticelli para preguntarle si Bosch podía conseguirle a Fraticelli un divorcio mejicano; que él les dijo

a "ellos" que Fraticelli debía conseguirse un divorcio en Nueva York porque "el divorcio de Méjico no le serviría para los fines que interesaba, que era proteger derechos hereditarios"; que Bosch "le dejó a ella escribir a Fraticelli"; que ella regresó poco después y le dijo que Fraticelli "estaba de acuerdo con su consejo", en virtud de lo cual él procedió a obtener un divorcio en Nueva York para Fraticelli; que cuando él le escribió a Soler "diciéndole que en vista de lo que me decía en cuanto a la urgencia, lo que debía hacer era obtener un divorcio en Méjico, lo que hice en la inteligencia de que por sus conversaciones con Fraticelli y por haber leído su correspondencia, Soler conocía los demás detalles de mi consejo, dados verbalmente y en cartas" de que el divorcio mejicano no sería reconocido en Nueva York.

Bosch procedió por su cuenta para persuadir a Soler que obtuviera un divorcio mejicano en lugar de uno de Nueva York. Nunca vió a Soler durante estos acontecimientos. Todos sus consejos a Soler se los dió por correspondencia. En su carta del 13 de octubre sugiriendo un divorcio mejicano le dió una elaborada explicación de las ventajas del divorcio mejicano. Pero cuidadosamente se abstuvo de mencionar el hecho más importante en cuanto al divorcio: que era inútil en Nueva York. Y es difícil creer que Soler hubiera consentido al plan de Bosch si hubiera sabido la verdadera naturaleza de un divorcio mejicano. Bosch no niega que era su deber advertirle a Soler este hecho, particularmente ya que la sugestión de un divorcio mejicano emanó de él y no de Soler. Pero su defensa es que él le dió tal consejo porque tenía derecho a asumir que la novia de Fraticelli le había escrito a Fraticelli que un divorcio mejicano no sería reconocido en Nueva York, y que Fraticelli o le había dicho eso a Soler o le había enseñado la carta.

No podemos comprender que un abogado pueda creer que estaba desempeñando a cabalidad su deber hacia un cliente como Soler por consejos suministrados de manera

tan informal sobre una cuestión tan importante. Pero aún si pudiéramos permitir tal conducta, el récord aquí está huérfano de prueba alguna, excepto la suposición de Bosch a ese efecto, de que Soler recibió tal consejo a través de esta ruta tortuosa. Bosch no ha presentado la declaración de Fraticelli,[20] de la joven, o carta alguna de él o de la joven a Fraticelli en apoyo de esta teoría.[21] Su caso descansa solamente en su argumento puramente especulativo de que esto fué lo que debió haber ocurrido.

Por otro lado, Soler ha negado esta versión de los hechos. Declaró ante el Comité de lo Judicial del Senado que nunca leyó carta alguna a Fraticelli de la novia de éste o de Bosch al efecto de que un divorcio mejicano no sería válido. Por el contrario, de conformidad con su declaración, se le hizo creer por las cartas de Bosch que un divorcio mejicano sería válido a todos los fines y le daría derecho a volverse a casar libremente en Nueva York; la primera insinuación de que el divorcio mejicano era nulo la recibió del Oficial Jurídico. Con excepción del testimonio de Soler ante el Comité de lo Judicial, la única otra evidencia competente ante nos sobre esta cuestión, es la correspondencia que ya hemos sintetizado. Y nadie que lea la carta de Bosch del 13 de octubre puede evitar llegar a la conclusión de que Soler razonablemente tenía derecho a deducir de la misma que un divorcio mejicano sería tan bueno, sino mejor, que un divorcio en Nueva York. De necesitarse más, aún Bosch aparentemente no alega que le mandó a decir a Soler por

---

[20] Fraticelli está ahora acantonado en Europa, pero es difícil creer que entre noviembre de 1944 y mayo de 1945 Bosch no hubiera podido conseguir un *affidavit* de Fraticelli sobre este punto, siendo Fraticelli su amigo desde la infancia y quien le ha escrito desde Europa.

[21] Las cartas del 5 de octubre de Bosch a Fraticelli y a Soler, respectivamente, fueron escritas mientras Bosch pensaba todavía que Soler conseguiría un divorcio en Nueva York. Y de cualquier modo, sobre el punto ahora ante nos, la carta a Fraticelli sólo dice que por ser el caso de Soler igual al de Fraticelli, si Soler quería saber algunos detalles, que Fraticelli le enseñara a Soler la carta original que Bosch le escribió a Fraticelli. Pero esa carta original o copia de la misma nunca se presentó en evidencia aquí.

la insegura ruta de la novia de Fraticelli—a Fraticelli—a Soler, o de algún otro modo, que solamente podría volverse a casar en Méjico por poder—que el propio Bosch dice es la piedra angular para estos divorcios mejicanos. En verdad, Soler pudiera estar ahora en presidio si no hubiera sido por la oportuna intervención del Oficial Jurídico del Ejército.

Al considerar este cargo, nos faltan palabras para exponer con el énfasis que quisiéramos, nuestra reprobación por la imperdonable despreocupación de Bosch hacia Soler en relación con el acontecimiento más importante en la vida de ese joven.

Estamos convencidos de que Bosch es culpable de los cinco cargos discutidos aquí.([22]) La prueba de cargos tan serios y la naturaleza del testimonio ofrecido en defensa de los mismos, merecerían de ordinario un severo castigo de nuestra parte. Pero en vista del hecho de que el récord demuestra que Bosch siempre ha gozado de una excelente reputación en los Estados Unidos continentales y en Puerto Rico, y en vista del hecho de que ninguno de los acontecimientos aquí envueltos ocurrieron en Puerto Rico, *dictaremos una resolución separando a Bosch de la práctica de su profesión de abogado en esta jurisdicción por el período de un año.*

---

([22]) No conduciría a ningún fin práctico examinar en detalle los cargos restantes. El cargo 6 le imputa que sustancialmente bajo las mismas circunstancias de hecho y de derecho envueltas en el caso de Soler, Bosch obtuvo un divorcio mejicano para Pedro N. Ortiz. Pero el Fiscal no ha probado este cargo, ya que el récord contiene evidencia adecuada para demostrar que Bosch le comunicó a su corresponsal el paradero de la Sra. Ortiz; además, el Fiscal no ha presentado prueba alguna para contradecir el *affidavit* de Bosch al efecto de que él explicó detalladamente a Ortiz el alcance limitado del divorcio mejicano.

El cargo 7 es un cargo general al efecto de que Bosch ha obtenido siete de tales divorcios mejicanos a sabiendas de que son nulos en los Estados Unidos donde los demandantes y los demandados están domiciliados, y que se le pagó por los demandantes por sus servicios profesionales en la creencia de que estaban obteniendo sentencias válidas de divorcio. Pero aquí tampoco hay prueba de que Bosch le hiciera creer a los demandantes que estaban obteniendo divorcios que serían reconocidos en Nueva York.