Opinión disidente emitida por la
Jueza Presidenta Señora Fiol Matta,* a la que se unen la Juez Asociada Señora Rodríguez Rodríguez y la Jueza Asociada Oronoz Rodríguez.
El 16 de octubre de 2014, una mayoría de este Tribunal empleó una metodología adjudicativa imprecisa y ambiva *845 lente para resolver que los Artículos 5, 6 y 11 de la Ley 109-2014 (Ley de Colegiación Obligatoria) son inconstitucionales porque inciden sobre nuestro poder inherente para reglamentar la profesión legal. A pesar que el trámite procesal atropellado de este caso no permitió el desarrollo de un expediente adecuado y completo, la mayoría injustificadamente cambió la forma en que hemos ejercido por décadas nuestro poder inherente. Peor aún, no respetó las restricciones que impone la doctrina de autolimitación judicial y se adentró a evaluar asuntos constitucionales que no era necesario atender. Al hacerlo, alteró de forma incomprensible el estado de derecho hasta entonces vigente —reiterado durante décadas por este Tribunal—, según el cual la colegiación obligatoria no vulnera el derecho a la libre asociación de los miembros de la clase togada.
La mayoría ancla su determinación a una conclusión de derecho sin premisas fácticas que la sustenten, imposibilitando el análisis sosegado y ponderado de las controversias que este caso presenta. Además, los fundamentos plasma-dos en la Opinión son inherentemente ambiguos y adolecen de una incongruencia tal que raya en la arbitrariedad. Eso los lleva a tomar una decisión incorrecta, pero más importante aún, vulnera nuestra legitimidad como máximos intérpretes de la Constitución.
I
El 28 de julio de 2014, el Estado Libre Asociado de Puerto Rico (Estado) promulgó la Ley de Colegiación Obligatoria. Entre otras cosas, esta legislación derogó la Ley Núm. 121-2009 y la Ley Núm. 135-2009 (Leyes de Descolegiación) y restituyó la obligación de matricularse en el Colegio de Abogados y Abogadas de Puerto Rico como requisito indispensable para ejercer la profesión legal en Puerto Rico.
*846 Ese mismo día, el Lie. Thomas Rivera Schatz impugnó la validez de la Ley. En su demanda, alegó que las disposiciones que exigen la colegiación obligatoria eran contrarias a su derecho constitucional a la libertad de asociación y expresión, y que usurpaban el poder inherente de este Tribunal para reglamentar la profesión de la abogacía. Simultáneamente, sin haber emplazado a las partes que demandó, el licenciado Rivera Schatz presentó un recurso de certificación intrajurisdiccional para que este Tribunal atendiera la controversia directamente. Asimismo, solicitó un injunction preliminar para paralizar los efectos de la Ley hasta tanto resolviéramos finalmente.
Al día siguiente, una mayoría de este Tribunal expidió el recurso de certificación intrajurisdiccional y paralizó los efectos de la Ley de Colegiación Obligatoria, sin trámite ulterior. Concedió al licenciado Rivera Schatz un término para que acreditara el emplazamiento de los demandados y decretó otro término de diez días para que las partes presentaran sus alegaciones afirmativas y alegatos.
El Estado, representado por la Oficina de la Procuradora General, se opuso y presentó una Solicitud Urgente de Reconsideración para que se denegara el recurso. En la alternativa, solicitó que se designara un Comisionado Especial que recibiera la prueba necesaria para desarrollar un expediente completo y suficiente, como se hizo en Colegio de Abogados de P.R. v. Schneider [I].(1) Sin embargo, la mayoría denegó esa solicitud sin explicación alguna.
Posteriormente, se expidieron y consolidaron otros dos recursos similares de certificación intrajurisdiccional, presentados por la Asociación de Abogados de Puerto Rico, el Lie. Héctor Ramos Díaz y el Lie. Rafael Sánchez Hernández,(2) así como los Ledos. John E. Mudd y John A. *847 Stewart.(3) Además, se concedió la intervención de más de una docena de licenciados y licenciadas, y se acogieron varios escritos de amigos de la corte.(4)
II
Antes de considerar los méritos de las alegaciones de las partes, miremos de cerca la utilización del recurso excepcional de certificación intrajurisdiccional en esta controversia. Su correcta evaluación nos requiere repasar aspectos básicos del funcionamiento y la estructura de nuestro ordenamiento judicial.
A. El ejercicio del Poder Judicial opera en un esquema de tres niveles compuesto por el Tribunal de Primera Instancia, el Tribunal de Apelaciones y el Tribunal Supremo.(5) Juntos, componen el Tribunal General de Justicia. Salvo contadas excepciones constitucionales y estatutarias,(6) un caso inicia su trámite ordinario en el Tribunal de Primera Instancia, foro encargado de recibir y evaluar prueba y adjudicar valor probatorio a la evidencia sometida por las partes.(7) Una vez el tribunal emite su dictamen, la parte que no esté conforme tiene la opción de acudir ante el Tribunal de Apelaciones. Ese foro determinará si la decisión del Tribunal de Primera Instancia es conforme a derecho.(8) Nuevamente, si una de las partes discrepa de lo decidido por el foro apelativo intermedio, puede acudir al Tribunal Supremo que, como norma general, será el foro de última instancia.(9)
*848 Este trámite permite que cuando el caso llegue ante nuestra consideración tengamos el beneficio de un expediente que incluya la prueba presentada ante el Tribunal de Primera Instancia, las determinaciones de hechos de ese tribunal y el análisis jurídico realizado por ese foro y por el Tribunal de Apelaciones. En el pasado, hemos señalado que es preferible que los casos maduren paulatinamente a través del trámite antes descrito, “pues ello permite que las controversias se diluciden y afinen sin que el foro de última instancia tenga que inmiscuirse a destiempo”.(10)
El trámite ordinario de los procedimientos puede obviarse mediante la expedición de una certificación intrajurisdiccional. Este mecanismo de carácter discrecional “nos permite traer de inmediato ante nuestra atención asuntos que se encuentran ante la consideración de foros inferiores”.(11) Por lo tanto, “por ser un recurso que nos per-mite circunvalar el trámite ordinario de un caso, su expedición es de carácter excepcional”.(12)
Como bien explica el Prof. Luis José Torres Asencio:
La naturaleza extraordinaria de la certificación intrajurisdiccional encuentra su justificación en el importante propósito de asegurar que los asuntos de derecho considerados por nuestros tribunales se sometan a un riguroso análisis por las instituciones fundamentalmente distintas que componen el esquema de tres niveles de nuestro sistema judicial [...] De esta manera, culminado el trámite ordinario, la intervención del Supremo puede ceñirse exclusivamente a su función primordial en nuestro ordenamiento: pautar derecho mediante la formulación de normas jurídicas de aplicación general en el sistema legal.(13)
*849 Por su carácter excepcional, al ejercer nuestra discreción para autorizar una certificación intrajurisdiccional, debemos considerar los siguientes elementos: (1) la urgencia, (2) la etapa en que se encuentran los procedimientos, (3) la necesidad que puede presentarse de recibir prueba y (4) la complejidad de la controversia.(14) Desafortunadamente, en tiempos recientes, una mayoría de este Tribunal ha utilizado el recurso de certificación desmesuradamente, y lo ha hecho en ausencia de justificaciones razonables que comuniquen la urgencia por la cual debamos prescindir del trámite ordinario.(15) Por ende, no es de extrañar que numerosos juristas y académicos hayan criticado con vehemencia esa tendencia de expedir selectivamente este recurso para resolver a destiempo ciertas controversias. Por ejemplo, el Prof. Efrén Rivera Ramos señala lo siguiente:
[...] [P]reocupa el uso frecuente de los recursos de certificación para elevar cuestiones litigiosas al Tribunal Supremo sin que se tenga el beneficio de desarrollar un récord fáctico apropiado en los tribunales inferiores. Si bien en determinadas y excepcionales ocasiones el recurso de certificación puede servir laudables fines de interés público, su generalización y abuso puede trastocar seriamente la administración de la justicia. Mal utilizado, puede privar a los litigantes, sobre todo a los que litigan contra el Estado, de la oportunidad de presentar adecuadamente sus reclamos, probar sus alegaciones y refutar las alegaciones del Estado demandado. En fin, puede escamotearles el derecho a que sus derechos se adjudiquen sobre bases fundadas en hechos establecidos mediante procesos confiables y justos. Ese abuso puede constituir, en definitiva, una privación efectiva a los litigantes de su día en corte.(16)
*850 B. Este caso es un ejemplo claro de esta tendencia, pues el recurso de certificación intrajurisdiccional se expidió en ausencia de justificación jurídica y sin considerar los criterios que hemos establecido para su expedición. En primer lugar, no existía la urgencia necesaria, pues el Artículo 13 de la Ley de Colegiación Obligatoria pospuso el imperativo de colegiarse hasta noventa días después del 1 de enero de 2015.(17) En segundo lugar, la demanda sólo llevaba un día de presentada. Tampoco se habían hecho los emplazamientos correspondientes. También, necesitábamos prueba que nos permitiera ejercer con mesura nuestra labor adjudicativa, tomando en cuenta que los demandantes alegaron que la legislación contravenía la doctrina de separación de poderes y violaba sus derechos constitucionales y que no había un interés apremiante del Estado que justifique la interferencia con los derechos de los y las demandantes.
El análisis adjudicativo de interés apremiante propuesto . por la parte demandante requería recibir y aquilatar prueba para poder determinar si el Estado cumplía con ese interés. Sin embargo, una mayoría de este Tribunal certificó el caso y lo removió del foro que recibiría la prueba y escucharía los testimonios, adjudicaría su valor probatorio y haría una determinación, precisamente, sobre el interés gubernamental perseguido al adoptar la ley en controversia. Tampoco concedió la solicitud del Estado de que se designara un Comisionado Especial que recibiera la prueba, a pesar de que esta herramienta se ha utilizado anteriormente en casos como éste, que se han certificado intrajurisdiccionalmente *851 antes de celebrarse una vista evidenciaria.(18) Por todo lo anterior, no procedía la utilización del recurso excepcional de certificación intrajurisdiccional.
III
Sin embargo, no se trata tan sólo de cumplir con el trámite procesal que la controversia requiere. Cuando ejercemos nuestra facultad de mayor peso y repercusión, la de interpretar nuestra Constitución, tenemos el deber de delimitar responsablemente el alcance de nuestra función adjudicativa.
A. Nuestra función como intérpretes de la Constitución y la ley no tiene un alcance indefinido. La doctrina de autolimitación judicial, basada en consideraciones prudenciales y constitucionales, nos impone ciertas restricciones al momento de ejercer esa función.(19) En E.L.A. v. Aguayo, adoptamos las restricciones que el Tribunal Supremo estadounidense estableció para guiar la evaluación de la validez constitucional de las leyes.(20) Entre éstas figuran las siguientes:
2. —La Corte “no se anticipará a decidir una cuestión de derecho constitucional antes de que sea necesario hacerlo”.
3. —La Corte “no formulará una regla de derecho constitucional más amplia que la que requieran los hechos precisos a los cuales ha de aplicarse”.
4. —La Corte no juzgará una cuestión constitucional aunque haya sido sometida propiamente en los autos, si también se somete un fundamento de otra índole que permita disponer del caso.(21)
*852 En ese caso hicimos énfasis particular en una restricción adicional, muy pertinente al caso que nos ocupa: “la Corte no entenderá en una cuestión constitucional si los autos no son adecuados para hacer una determinación de esa índole”.(22)
B. En el caso ante nuestra consideración se invocaron, principalmente, dos fundamentos, ambos revestidos de carácter constitucional: (1) la doctrina del poder inherente de este Tribunal para reglamentar la profesión de la abogacía, basada en la doctrina constitucional de la separación de poderes, y (2) los derechos constitucionales a la libertad de asociación y libertad de expresión. Como la interpretación pertinente al segundo fundamento incide sobre derechos constitucionales, no sólo de las partes, sino de la ciudadanía en general, la manera correcta y prudente de atender esta controversia, a la luz de las restricciones que impone la doctrina de autolimitación judicial, era la siguiente.
En primer lugar, está claramente establecido en nuestro ordenamiento que la Ley de Colegiación Obligatoria es directiva y no mandatoria. Por eso, antes de entrar en cualquier análisis constitucional, lo que este Tribunal tenía que decidir era si, en el ejercicio de su poder inherente, aceptaba o rechazaba dicha Ley. Si la aceptaba, procedía entonces evaluar las alegaciones de los demandantes sobre sus derechos constitucionales a la libre asociación y expresión. Si esa evaluación nos llevara a concluir que la ley no viola esos derechos al establecer la colegiación obligatoria, se sostendría su validez. La conclusión contraria, es decir, que la ley viola esos derechos, conllevaría una declaración de inconstitucionalidad.(23)
*853 Por otro lado, si el Tribunal decidiera que la Ley de Colegiación Obligatoria no complementa satisfactoriamente nuestra facultad para reglamentar la profesión, tan sólo tendría que ejercer su poder inherente y rechazarla. Al resolver de esta forma, la doctrina de autolimitación judicial nos exigiría abstenernos de pronunciamientos sobre los derechos constitucionales a la libertad de asociación y expresión.
Al atender la controversia de este caso, la mayoría obvió por completo y sin justificación esta estructura de análisis jurídico que nos exige la doctrina de autolimitación judicial. Ciertamente, este método puede descartarse en situaciones apropiadas, pero hacerlo requiere una justificación responsable que la Opinión mayoritaria no ofrece. Su posición sobre nuestro poder inherente para reglamentar la profesión y su consecuente rechazo a la Ley de Colegiación Obligatoria eran suficientes para disponer del caso; no debió pronunciarse sobre el derecho a la libre asociación.
IV
Comenzamos nuestro análisis sobre los méritos de la controversia examinando el poder inherente que tiene este Tribunal para reglamentar la profesión legal en Puerto Rico, con el propósito de indagar sobre sus orígenes, su naturaleza y la prudencia que debe guiar el ejercicio del mismo. Esto porque, aunque de forma ambigua y ambivalente, la Opinión mayoritaria parece apoyar su dictamen en esa doctrina. En efecto, la Opinión expresa, que
[...] la controversia que nos corresponde resolver se reduce a examinar si el sistema de colegiación obligatoria es compatible con lo que esta Curia, al amparo de nuestro Poder Inherente para reglamentar la profesión legal, entiende debe ser un requisito para que los abogados ejerzan legítimamente su profesión en Puerto Rico.(24)
*854 Esta expresión parece indicar que para contestar la interrogante sobre la compatibilidad de la ley con el ejercicio de nuestro poder inherente lo único que se requiere es evaluar si el establecimiento de la colegiación obligatoria contradice o contraviene de alguna forma nuestro poder inherente de reglamentación. A eso, según la Opinión, se limita o reduce el asunto.
A. El poder inherente para regular la profesión de la abogacía en Puerto Rico se deriva del principio de separación de poderes, plasmado en la Sección 2 del Artículo I de nuestra Constitución.(25) La separación de poderes, además de delegar funciones específicas a cada rama gubernamental, implica la colaboración entre éstas en la consecución y realización de un gobierno democrático. Por lo tanto, “no significa que el gobierno se divide en tres compartimentos cerrados, sin conexión o dependencia entre ellos”.(26) Así, el principio presupone “[un] delicado balance de poderes”(27) que a su vez se sirve de un sistema de pesos y contrapesos entre las tres ramas de gobierno. De esta manera, nuestra Constitución regla que los poderes delegados a cada rama se complementen para evitar abusos de poder y asegurar la buena marcha de la gestión gubernamental.
La delegación de los poderes ejecutivo, judicial y legislativo a las tres ramas del gobierno ha resultado en la invocación por cada una de éstas de ciertos poderes inherentes a sus funciones y facultades. En lo que a nosotros respecta, desde muy temprano en nuestra historia, este Tribunal ha reclamado su poder inherente para regular la profesión de la abogacía en Puerto Rico, inclusive la admisión y suspensión de abogados y abogadas en nuestra jurisdicción.(28) No obstante, con igual consistencia hemos *855 reconocido la posibilidad de que una acción legislativa complemente nuestro poder inherente. Hemos afirmado que la Legislatura, al amparo de su poder de razón de estado, puede establecer requisitos para regular la admisión de abogados y abogadas al ejercicio de la profesión, sin usurpar nuestro poder inherente. Dicha legislación “sería ‘puramente directiva, no mandatoria’ para este Tribunal”.(29) Por lo tanto, hemos resuelto continuamente hasta ahora, que este Tribunal, en virtud de su poder inherente, determinará si acoge o rechaza cualquier legislación que afecte nuestra función de reglamentar la profesión legal. Al igual que cualquier decisión en función del ejercicio de un poder constitucional, esta determinación requiere razones y fundamentos que la sustenten. La legitimidad del ejercicio de cualquier poder depende de su juricidad y, por lo tanto, de sus fundamentos. Por eso, siempre hemos sido cuidadosos en exponer las razones que justifican la adopción o el rechazo de una legislación que, de una manera u otra, incide en nuestro poder inherente de reglamentación.
Este Tribunal ha confrontado medidas legislativas que complementan su poder de reglamentar la profesión primordialmente en tres aspectos: (1) los requisitos y condiciones para la admisión a la práctica de la profesión; (2) las sanciones disciplinarias que pueden imponerse a los abogados, y (3) el establecimiento de la colegiación obligatoria. Los intereses tutelados en estos contextos son distintos como también lo son las controversias que cada uno plan-tea con relación al ejercicio de nuestro poder inherente.
En el contexto de la admisión a la profesión, en Ex parte *856 Boneta,(30) examinamos legislación que eximió del requisito de tomar el examen de reválida para la admisión al ejercicio de la abogacía a aspirantes que se hubiesen graduado como abogados de universidades acreditadas en Estados Unidos y Europa siempre y cuando probasen, a satisfacción de este Tribunal, que habían practicado durante por lo menos cinco años en un bufete autorizado o que hubiesen fungido como jueces municipales durante cuatro años. Dos aspirantes que cumplían con los requisitos establecidos en la ley intentaron infructuosamente ser admitidos por el Tribunal Supremo a la práctica de la profesión. Resolvimos, en función de la doctrina de autolimitación judicial, que al emplear la frase “podrá ser admitido” y no el imperativo “deberá ser admitido” la Legislatura no menoscabó la facultad judicial de admitir abogados al Foro. Consideramos innecesario atender el asunto relativo a la intromisión del Poder Legislativo en nuestro poder de reglamentar la profesión y simplemente denegamos la admisión solicitada. En un caso posterior, López Santiago, Ex parte,(31) reiteramos esta norma y negamos la admisión a una abogada que se amparó en la misma disposición legislativa.
En el contexto de las sanciones disciplinarias, en In re Abella(32) ordenamos el desaforo de un abogado, a pesar de que, según su alegación, dicha sanción no estaba reglada en la Ley de 11 de marzo de 1909.(33) Reiteramos la norma pautada en In re Tormes,(34) a los efectos de que un abogado podía ser disciplinado por causas no contenidas en esa ley, pues el poder de reglamentación sobre la abogacía le per-mite a este Tribunal disciplinar por los motivos que considere apropiados. En estos casos, impusimos las sanciones disciplinarias que consideramos adecuadas, al amparo de *857 nuestro poder inherente de reglamentar la profesión, sin sentirnos atados a la legislación ni entrar en consideraciones sobre su constitucionalidad. Sencillamente, concluimos que la legislación no nos obligaba. No rechazamos la legislación complementaria sobre la reglamentación de la profesión ni decretamos su inconstitucionalidad. Por lo tanto, no es correcto aseverar que el Tribunal anuló la legislación directiva sobre la admisión a la profesión legal; mucho me-nos podemos considerar que la declaró inconstitucional por violar el principio de separación de poderes.(35)
En los casos reseñados, nuestras decisiones, si bien se han fundamentado en nuestro poder inherente, no han considerado que la actuación legislativa constituye una usurpación de dicho poder. En ambos casos, las controversias exigían, simplemente, resolver si se permitía la admisión de ciertas personas a la profesión o si se impondrían sanciones a abogados en asuntos disciplinarios no cubiertos por ley. Los peticionarios en los casos de admisión y los querellados en los casos de las sanciones disciplinarias no alegaron que la medida legislativa en la que se amparaban usurpaba el poder inherente de este Tribunal. Por el contrario, en todos los casos fue el Tribunal quien motu proprio pasó a considerar la relación entre la función legislativa y sus facultades al amparo de ese poder.
En Schneider [I], por primera vez, una parte querellada recurrió al poder inherente del Tribunal para sustentar su posición. En ese caso, el Colegio se querelló contra varios abogados que no habían pagado su cuota. Los querellados plantearon que la Asamblea Legislativa no podía establecer requisitos para la práctica de la profesión porque dicha facultad era exclusiva del Tribunal Supremo.(36) Al resolver *858 que el planteamiento de los querellados era improcedente, expresamos:
Es inmeritorio el argumento de los querellados de que la Asamblea Legislativa de Puerto Rico carece de poder para ordenar, como hizo en 1932, la integración de nuestro foro. Es cierto, según hemos señalado repetidas veces, que la admisión al ejercicio de la abogacía es función inherente de este Tribunal y que la legislación aprobada sobre esta materia, tal como la Ley Núm. 43, “es puramente directiva, no mandatoria para esta Corte”. La preeminencia de la acción judicial en este campo, el cual incluye naturalmente la facultad de pasar juicio sobre si debe unificarse o no el foro en una jurisdicción y bajo qué condiciones, no significa que la legislación sobre estos particulares que no conflija con las pautas que este Tribunal establezca sea nula. (Citas omitidas y énfasis suplido).(37)
En otras palabras, contrario a lo que alegaron los demandados, la legislación que exigía que los miembros de la clase togada fueran miembros del Colegio no infringía el poder inherente de este Tribunal para reglamentar la profesión. Esa legislación se había aceptado en nuestra jurisdicción como complementaria a ese poder. No podía ser de otra manera, ya que, desde 1838, el Colegio había desempeñado un rol fundamental en el desarrollo de la profesión jurídica puertorriqueña. Por lo tanto, el requisito de pertenecer a esa institución servía a los mejores intereses de este Foro, de los miembros de la clase togada y de la ciudadanía en general.
A pesar de la decisión del Tribunal en Schneider [I], la colegiación obligatoria fue objeto de múltiples pleitos subsiguientes, tanto a nivel estatal como federal. En todos, se confirmó la validez de este dictamen. Además, como discutiremos más adelante, la jurisprudencia estatal y federal validó la colegiación ante reclamos de que ésta vulneraba el derecho de los abogados a la libre asociación.
El asunto pareció estar resuelto hasta que, en el 2009, la Asamblea Legislativa aprobó dos proyectos que se con *859 virtieron en las Leyes de Descolegiación. Ambas leyes eliminaron el carácter obligatorio de la colegiación como requisito para ejercer la profesión legal en Puerto Rico y privaron al Colegio de las competencias disciplinarias que por más de siete décadas había ejercido en conjunto con este Tribunal.(38) Legislación posterior también eliminó la participación del Colegio en las evaluaciones de nombramientos judiciales y limitó la facultad de éste para expresarse sobre asuntos religiosos y políticos.(39)
El Colegio impugnó ambas leyes en un recurso que invocó la jurisdicción original de este Tribunal y que fue denegado. Cuando finalmente llegó la controversia a nuestra consideración en el 2011, se denegó el auto de certiorari presentado por el Colegio. En esa ocasión, se rechazó el planteamiento de que tanto la Ley Núm. 43 de 14 de mayo de 1932, que estableció la colegiación obligatoria, como las Leyes de Descolegiación, usurparon el “poder de este Tribunal para reglamentar la profesión”.(40) Por el contrario, este Tribunal afirmó que
[las leyes 121 y 135 de 2009] no son otra cosa que el ejercicio por la Asamblea Legislativa de su facultad para regular la estructura y funcionamiento del Colegio de Abogados, las mismas facultades que la Asamblea Legislativa empleó al crear el Colegio mediante la Ley Núm. 43 de 14 de mayo de 1932. Fue esa ley de 1932, y no este Tribunal, la que creó el Colegio de Abogados e hizo compulsoria su membresía.
*860 Ninguna de esas leyes usurpó el poder de este Tribunal para reglamentar la profesión de la abogacía en Puerto Rico. Tampoco conflige con lo qne hemos pautado al respecto. La variación de la colegiación —de obligatoria a voluntaria— no elimina el Colegio, no contradice ninguna pauta establecida en el ejercicio de nuestro rol como ente que reglamenta la profesión legal ni soslaya el axioma de la separación de poderes, base de nuestro sistema republicano de gobierno. (Citas omitidas y énfasis suplido).(41)
La Resolución no explicó por qué la colegiación obligatoria ya no se consideraba necesaria y complementaria al poder inherente del Tribunal para regular la profesión, como habíamos resuelto en Schneider [I].(42) Tampoco se consideraron las funciones que el Colegio realizaba en bien de la justicia y para el mejoramiento de la profesión. Entre las funciones importantes del Colegio, el profesor Figueroa Prieto resalta las siguientes: (1) ofrecer un programa pro bono para coordinar la representación legal a indigentes y garantizar el acceso a la justicia para los sectores marginados; (2) cooperar en las evaluaciones de candidatos a puestos judiciales; (3) comentar proyectos de ley y sus implicaciones en nuestro ordenamiento; (4) promover actividades culturales y artísticas; (5) ofrecer orientación legal gratuita a la ciudadanía; (6) proveer voluntarios para servir como observadores en actividades en las cuales los ciudadanos ejercen el derecho de libertad de expresión; (7) administrar eficientemente un fondo para facilitar la prestación de la fianza notarial; y, finalmente, (8) asistir a este Tribunal en el ejercicio de su poder disciplinario sobre la clase togada. La Opinión que provoca nuestro disenso no discute ninguna de estas funciones, ni su importancia para la profesión jurídica del País.
*861 Nuestras decisiones en los casos recientes sobre la colegiación obligatoria, en los que específicamente se ha planteado que la Asamblea Legislativa ha usurpado nuestro poder inherente de reglamentar la abogacía, han demostrado que este Tribunal es inaceptablemente incoherente en el ejercicio de ese poder. En Schneider (I) se estableció que la determinación de integrar el Foro nos correspondía en virtud de nuestro poder inherente, y que la colegiación obligatoria servía a los mejores intereses de nuestra sociedad. Sin embargo, cuando el Colegio impugnó las Leyes de Descolegiación de 2009, una mayoría de este Tribunal se negó a atender dos recursos distintos que aducían, justamente, que las acciones legislativas contravenían esa norma. En ese momento, la mayoría parecía conforme con rendir nuestro poder inherente de reglamentar la profesión, que abarca la determinación respecto a la conveniencia de un gremio unificado. Ahora, se emite una Opinión que hace todo lo contrario. Esta incongruencia es muy preocupante, pues se presta a críticas de arbitrariedad en el ejercicio del poder inherente de reglamentar la profesión jurídica.
B. Con el beneficio de la trama histórica, social y política de la colegiación obligatoria en Puerto Rico, nos resulta desconcertante la disposición, facilidad y celeridad con que la mayoría de este Tribunal decidió atender el caso que nos ocupa. Más aún, nos parece sumamente contradictorio el hecho de que, para disponer de las controversias planteadas, la mayoría se ampare precisamente en el poder inherente que hace tan sólo tres años se negó a ejercer.
Para sustentar su determinación de que la colegiación obligatoria infringe tal poder, la Opinión mayoritaria ofrece una explicación escueta basada en su apreciación de que la profesión legal ha funcionado adecuadamente desde que se eliminó la colegiación obligatoria. Propone que esto se debe a que “la Rama Judicial ha seguido funcionando eficientemente”(43) en la reglamentación ética de la con *862 ducta de los abogados y abogadas, sin la ayuda del Colegio. Explica, también sucintamente, que no se ha probado que haya una merma en la calidad de los servicios profesionales ni falta de atención a los procedimientos disciplinarios. Luego de estas generalidades, algunas de ellas especulativas y sin fundamento, la Opinión mayoritaria critica el hecho de que el Estado no demostró una deficiencia en el funcionamiento de la profesión durante los años de descolegiación. De esta forma, se le exige al Estado que justifique la conveniencia de adoptar la colegiación obligatoria, a pesar de que el procedimiento de certificación escogido por la mayoría, inclusive el rechazo al nombramiento de un Comisionado, no le dio la oportunidad de probar absolutamente nada.
La mayoría determina que no hay base suficiente para avalar la integración del Foro en nuestra jurisdicción, conforme a la experiencia de los últimos cinco años en los que la colegiación ha sido voluntaria. Cabe preguntarse entonces: ¿Cómo se justifica concluir que la experiencia de cinco años es suficiente para afirmar que podemos prescindir de la colegiación obligatoria? ¿Cómo, entonces, no fue suficiente la experiencia de setenta y siete años durante los cuales imperó en nuestro ordenamiento la colegiación obligatoria para llamar la atención de una mayoría de este Tribunal cuando ésta fue descartada por la Legislatura?
La postura mayoritaria, además de ser inherentemente injusta, es totalmente ilógica. La realidad es que, para salvaguardar la legitimidad del ejercicio de nuestro poder inherente, el Tribunal es quien debe exponer las razones por las que rechaza la legislación sugerida. El ejercicio de nuestro poder inherente no puede estar sujeto tan sólo a los criterios particulares de los miembros de este Foro. Más bien, es imperativo que ejerzamos ese poder de una manera razonable y consecuente, que propenda a la estabilidad de la profesión. Además, debemos reconocer que el concepto “inherente” no significa, sin más, la cualidad de *863 “exclusivo”.(44) Es decir, la naturaleza “inherente” del poder de este Tribunal para regular la profesión no está reñida con algún grado de participación de la Legislatura. Ésa ha sido la doctrina durante muchos años, en Puerto Rico y en otras jurisdicciones. Precisamente, algunas de las jurisdicciones de Estados Unidos han seguido el modelo de unificar sus foros mediante la participación legislativa. En trece de ellas, la colegiación obligatoria fue lograda con alguna participación de la Legislatura. En siete de éstas, la colegiación obligatoria fue un esfuerzo conjunto entre el Tribunal y la Legislatura.(45) Sabemos que cualquier legislación sobre requisitos de admisión al ejercicio de la profesión tiene tan sólo fuerza directiva, pero eso no significa que debamos rechazar las medidas complementarias de la Rama Legislativa de nuestro gobierno sin un análisis cuidadoso y fundamentado con prueba que justifique nuestra determinación.
El poder inherente del Tribunal Supremo se da en función de la independencia judicial, pero opera en el contexto de un gobierno que se rige por la separación de poderes y el balance entre éstos. Por eso, no es, ni puede ser, un poder absoluto. Por el contrario, como todo poder, está sujeto a perder su legitimidad si se ejerce injustificadamente y de manera arbitraria. Así lo ha reconocido el Tribunal Supremo de Estados Unidos al delimitar los contornos de los poderes inherentes de las cortes federales: “el alcance de estos poderes debe ser delimitado cuidadosamente, pues cuando una Rama de Gobierno emprende la tarea de definir su propia *864 autoridad, sin el beneficio de cooperación o escrutinio de las demás, existe el peligro de extralimitarse”. (Traducción nuestra).(46)
Para revocar décadas de jurisprudencia y alterar el balance entre el Poder Legislativo y el Judicial en la regulación de la profesión legal, era imprescindible recibir prueba que nos permitiera hacer un balance de los intereses de las partes y del beneficio que el Pueblo de Puerto Rico pudiera derivar de un foro integrado. Ello, a su vez, nos requería examinar con mayor cuidado la utilidad que representa el Colegio para la sana administración de la justicia.
Una vez contáramos con esa prueba, si al entender de la mayoría del Tribunal quedaba demostrado el beneficio de la descolegiación, era imperativo justificar claramente las razones para rechazar, al amparo de nuestro poder inherente, la legislación que promueve un foro integrado. Era igualmente imperativo explicar las razones por las cuales las expresiones siguientes del Juez Asociado Negrón García en Schneider [Z] perdieron validez:
[...] la asociación compelida y la reglamentación de la profesión de abogados está inexorablemente atada a esa eficaz gestión pro la justicia. No es posible entonces divorciar una de la otra; el sistema judicial integrado es la médula de la dinámica operacional constitucional y también va de la mano con el régimen unificado de colegiación compulsoria. Forma parte y es congruente con ese mandato y diseño parlamentario de mayor trascendencia que necesariamente ha de ceder al concepto, también importante, de una libertad incondicionada de asociación.(47)
En ausencia de esa prueba, no es suficiente la conclusión generalizada de que la reglamentación de la profesión legal no se ha visto afectada por la ausencia de un sistema *865 de colegiación obligatoria en los pasados cinco años. Esa afirmación sin base fáctica no es fundamento suficiente para resolver que la Asamblea Legislativa de Puerto Rico intervino inconstitucionalmente con nuestro poder inherente de reglamentar la profesión. No es lo mismo utilizar nuestro poder inherente para rechazar una ley directiva en materia de reglamentación profesional que declararla inconstitucional. Tampoco es suficiente aseverar que el Estado falló en probar la necesidad de la colegiación obligatoria para rechazar dicha ley directiva. Al ejercer nuestro poder inherente, la mayoría de este Tribunal tenía el deber de apoyar su conclusión en determinaciones sustentadas en el expediente que fueran suficientes para alterar el ordenamiento jurídico vigente.
El procedimiento escogido por la mayoría no permitió contar con prueba para concluir que la administración de la justicia no se ha visto afectada por el cambio de colegiación obligatoria a voluntaria. Para empezar, la manera en que la Opinión mayoritaria caracteriza el buen funcionamiento de la justicia es preocupante. El que este Tribunal atienda numerosas quejas disciplinarias contra abogados no puede ser el criterio para medir el acceso a la justicia ni tantos otros factores relacionados a la práctica legal. Tampoco podemos afirmar que hay tal buen funcionamiento porque “el sistema de justicia no se ha quebrantado”.(48)
Por otra parte, es importante destacar que la mayoría sólo declara inconstitucionales los Artículos 5, 6 y 11 de la Ley de Colegiación Obligatoria, sin siquiera citarlos. De esta forma, la Opinión mayoritaria deja vigente toda una serie de disposiciones relacionadas con el ámbito disciplinario de la profesión. Por ejemplo, el Artículo 3(o) de la ley faculta al Colegio a “[r]ecibir e investigar las quejas que se formulen respecto a la conducta de los abogados integrantes del Colegio en el ejercicio de la profesión, para lo cual ejercitará los *866 poderes y prerrogativas que le confiere esta Ley”.(49) De igual forma, el Artículo 4 dispone todo un procedimiento para atender las quejas que reciba la Comisión de Etica del Colegio.(50)
Más allá de esta incongruencia, la decisión de rechazar la colegiación obligatoria es una decisión de política pública sobre la Rama Judicial. Por lo tanto, la responsabilidad de justificar el rechazo de legislación directiva recae sobre esta Rama, como se ha establecido históricamente mediante el rechazo de legislación que incide sobre nuestro poder inherente. Por eso resulta preocupante que la mayoría entienda que los beneficios que se derivan de la colegiación obligatoria no contribuyen a la sana administración de la justicia, a la vez que mantiene vigentes las facultades disciplinarias del Colegio.
Por último, resaltamos el error de declarar una ley inconstitucional por el sólo hecho de que interfiere con el ejercicio de nuestro poder inherente. Como indicamos, de ser ese el caso, lo correcto en derecho, y lo que va acorde con las restricciones que nos impone la autolimitación judicial, sería rechazar la ley. Pero la Opinión mayoritaria va más allá. No sólo declara inconstitucionales los Artículos 5, 6 y 11 de la Ley de Colegiación Obligatoria al amparo de nuestro poder inherente, sino que también parece indicar que el ejercicio del poder inherente permite a este Tribunal determinar la constitucionalidad de una ley por entender que vulnera el derecho de asociación de los abogados y abo *867 gadas de Puerto Rico.(51) Esta incongruencia conceptual y metodológica, más que llamarnos la atención, nos causa desasosiego. Contrario a lo que afirma la mayoría, la determinación respecto a la constitucionalidad de la Ley de Colegiación Obligatoria en cuanto al derecho a la libertad de asociación no es un “elemento importante al momento de ejercer [el] Poder Inherente para regular la profesión legal [...]”.(52) El poder que ejerció la mayoría no fue el poder inherente para reglamentar la profesión, sino el poder de revisión judicial para entrar a considerar indebidamente el derecho a la libertad de asociación en su vertiente negativa.
V
Esta incongruente y ambigua argumentación jurídica nos obliga a exponer la normativa pertinente al derecho a la libre asociación en su vertiente negativa. Ello nos permitirá evaluar si existían fundamentos jurídicos o circunstancias excepcionales que justificaran abandonar el efecto vinculante que la norma que establecimos en Schneider [I](53) tuvo por décadas.
A. Nuestra Constitución establece que “[l]as personas podrán asociarse y organizarse libremente para cualquier fin lícito, salvo en organizaciones militares o cuasi militares”.(54) Esta protección constitucional fue articulada, *868 evidentemente, en términos positivos. Sin embargo, se ha reconocido una vertiente negativa de este derecho, por lo que también se ha tutelado constitucionalmente el derecho de las personas a no asociarse.(55) Respecto a ambas vertientes, es doctrina firmemente establecida en nuestra jurisdicción que el derecho a la libre asociación no es absoluto.(56)
El derecho a la libre asociación no se encuentra expresamente reconocido en la Constitución de Estados Unidos. Más bien, se le considera un corolario del derecho a la libertad de expresión, tutelado por la Primera Enmienda y aplicable a los estados a través de la Decimocuarta Enmienda.(57) La incorporación jurisprudencial del derecho a la libre asociación en el Derecho Constitucional *869 federal también ha reconocido una vertiente positiva(58) y negativa(59) del mismo. Ninguna de éstas configura un derecho absoluto.
Al no ser un derecho absoluto, la libertad de asociación, al igual que el derecho a no asociarse, puede ceder en determinadas circunstancias ante intereses de mayor jerarquía o ante situaciones que revistan un alto interés público. En lo que atañe a la vertiente negátiva del derecho a la libre asociación, que es la que nos ocupa, entendemos que Schneider [i] calibra adecuadamente los intereses en pugna, consideradas las particularidades de la incorporación de este derecho en nuestro ordenamiento constitucional.
B. En Schneider [Z], este Tribunal, aplicando un balance de intereses, determinó que
[l]os intereses públicos en la creación de una sociedad vigorosamente pluralista, en el mejoramiento de la abogacía y en la buena marcha del sistema judicial pesan decididamente más que las inconveniencias personales que pueda acarrear en ciertos casos la colegiación obligatoria. El derecho a la no asociación derivable del derecho contrario consagrado en la Constitución del Estado Libre Asociado, Art. II, Sec. 6, cede ante los intereses señalados, de naturaleza claramente imperiosa bajo la constitución puertorriqueña.(60)
Al utilizar el análisis de balance de intereses, el Tribunal evaluó en detalle la cuantiosa prueba presentada por las partes. Además, tomó en consideración la pluralidad de los intereses en pugna. Por un lado, evaluó el interés personal de los abogados y las abogadas disidentes respecto a las posturas ideológicas o institucionales del Colegio y el posible menoscabo a su derecho a la libertad de asociación y expresión. Por el otro, tomó en consideración el interés del Estado y del propio Tribunal en unificar la profesión legal *870 del País, para el mejoramiento de la clase togada y el fortalecimiento de la administración de la justicia. Consiguientemente, evaluó el rol del Colegio no sólo en lo relacionado con sus competencias disciplinarias, sino también en atención a la multiplicidad de servicios que provee, tanto a la profesión legal como a la comunidad en general.(61)
Los argumentos de la Opinión mayoritaria para rechazar el análisis de Schneider [Z] y declarar que el esquema de la colegiación obligatoria es inconstitucional no son convincentes. Los peticionarios no nos han puesto en posición de poder reevaluar la norma establecida en Schneider [Z]. Más aún, dado el desatinado trámite procesal de este caso, no contamos con un expediente completo que nos permita hacer una determinación sobre la idoneidad de la colegiación obligatoria. Por lo tanto, el balance de intereses efectuado por este Tribunal en Schneider [Z], en el contexto de la clase togada y sus particularidades gremiales, nos parece que constituye el método adecuado para atender posibles vulneraciones al derecho a la libre asociación en su vertiente negativa. Este resulta un análisis particularmente apropiado cuando el Estado regula profesiones que están revestidas de alto interés público.
Hoy, al igual que en 1982, es innegable que la regulación diligente y efectiva de la profesión de la abogacía incide de manera trascendental en la sana administración de la justicia. Los abogados y las abogadas no son sólo funcionarios de la Rama Judicial; el Estado Libre Asociado de Puerto Rico delega en ellos ciertas funciones, como la fe pública notarial, que son esenciales en nuestra jurisdicción. Quienes ejercen la profesión jurídica, como custodios de conocimiento *871 y destrezas especializadas, tienen la responsabilidad de velar porque el resto de la ciudadanía tenga un verdadero acceso a la justicia que se imparte en nuestros tribunales.
Disgregar la profesión legal sólo contribuye a eliminar un espacio vital y unitario para que la profesión, toda, pueda discutir los asuntos que eminentemente le atañen. No se debe perder de vista que
[e]l Colegio [de Abogados y Abogadas] es una entidad democrática. Su Presidente, su Junta de Gobierno y las directivas de las Delegaciones son electos en asambleas que garantizan a todos los colegiados la participación, libre expresión y el derecho a presentar y debatir resoluciones. En la asamblea anual se aprueba el presupuesto de la institución. La vida institucional propicia la participación abierta y la tolerancia. (Énfasis suplido).(62)
La solución correcta no es prescindir de lo que ha sido buen derecho durante la mayor parte de la historia de nuestra profesión para propiciar la desunión de la clase profesional y destruir espacios de discusión. Por el contrario, lo conveniente sería utilizar nuestro poder inherente para propiciar la existencia de un espacio de discusión y debate inclusivo, representativo y democrático, en el cual la comunidad legal, en un marco de respeto, pueda armonizar sus diferencias para beneficio del Derecho Puertorriqueño. Cabe recordar, además, que el asunto que nos compete es la colegiación obligatoria, no exclusiva. Es decir, los abogados y las abogadas que disientan de las posturas que asuma el Colegio tendrían diversos medios para salvaguardar y evitar cualquier vulneración a su derecho a la libre expresión.
VI
En fin, disentimos de lo resuelto en la Opinión mayoritaria por múltiples razones. Insistimos en que, al abusar del recurso de certificación intrajurisdiccional, se impidió el de *872 sarrollo de un expediente adecuado para poder evaluar los dos asuntos medulares ante nuestra consideración: (1) si la colegiación obligatoria complementa nuestra facultad de reglamentar la profesión de la abogacía, para determinar sensatamente si aceptábamos o rechazábamos la Ley de Colegiación Obligatoria en virtud de nuestro poder inherente, y (2) si la Ley de Colegiación Obligatoria era constitucional a la luz de los derechos constitucionales invocados por los demandantes.
También discrepamos del errado proceder mayoritario de declarar inconstitucional la Ley de Colegiación Obligatoria tan sólo por ser, según su criterio, innecesaria para la regulación de la profesión de la abogacía y la administración de la justicia.
Reiteramos, además, que la Opinión mayoritaria no debió pronunciarse sobre el derecho constitucional a la libre asociación. Varias de las restricciones de la doctrina de autolimitación judicial así lo exigían. En vez, la Opinión mayoritaria utiliza un análisis especulativo sobre presupuestos hipotéticos para alterar la normativa constitucional aplicable al derecho de los abogados y las abogadas del País a la libre asociación en su vertiente negativa. No articula razones legítimas para ello.
Como si fuera poco, la mayoría revocó, sin más, “aquellas partes de Colegio de Abogados de Puerto Rico v. Schneider, supra, que sean incompatibles con los pronunciamientos que anteceden". Esto, sin especificar las razones para apartarse de la norma y sin considerar las salvaguardas pautadas en Schneider [I] y [II]. Como indicamos, este proceder desatinado disloca la estabilidad que provee el precedente en nuestro ordenamiento jurídico.(63) Reconoce *873 mos que, en nuestro sistema, los precedentes no están escritos en piedra y que en ciertos momentos puede convenir reevaluar un precedente para adecuar nuestro estado de derecho a los cambios o necesidades de una sociedad democrática y pluralista. Abora bien, ese ejercicio debe anclarse en un análisis jurídico responsable, sosegado y, sobre todo, capaz de demostrar a la ciudadanía las razones que ameritan trastocar la norma jurídica existente. Así se lograría lo que propone el Prof. Hiram Meléndez Juarbe:
El ciudadano no le exige al juez que renuncie a su humanidad y se ajuste a un ideal de objetividad en última instancia inasequible. Solo le exige que resuelva controversias sobre la base de justificaciones razonables y a las que no podamos atribuirle arbitrariedad, capricho, amiguismo, o que tengan su razón de ser en la afiliación política, religiosa o meramente ideológica. El ciudadano exige que ese productor del derecho que llamamos juez hable con una palabra que esté respaldada por el derecho y sus razones. Solo le pide que demuestre la disposición de convencer a una población, diversa y heterogénea, de que sus opiniones son defendibles y que han tomado en consideración un amplio universo de posibilidades. Solo así el Juez y el ciudadano podrán decir que las posturas descartadas (y por ende, aquellos que las sostienen) han sido tratadas con respeto y dignidad.(64)
Recalcamos que la certificación intrajurisdiccional tan apresurada impidió recibir la prueba necesaria para atender las controversias que presenta este caso. El expediente incompleto de este caso nos impedía descartar los beneficios y ventajas que el foro integrado tuvo en nuestra jurisdicción por casi un siglo. Después de todo, el ejercicio decisional, como cualquier enunciado lógico, debe partir de las premisas generales que proveen las normas. Sin embargo, *874 requiere determinaciones de hechos para poder llegar a la decisión individualizada.(65) Los hechos son el puente necesario entre los márgenes de la ribera. Sin ellos sólo puede darse un salto al vacío.
Por todo lo anterior, disentimos.

 Colegio de Abogados de P.R. v. Schneider [I], 112 DPR 540 (1982) (Schneider [I]).

 CT-2014-9.

 CT-2014-10.

 Véase la Opinión mayoritaria, págs. 799-800.

 4 LPRA sec. 24b.

 Art. V, Sec. 5, Const. ELA, LPRA, Tomo 1; 4 LPRA sec. 24s.

 4 LPRA sec. 25a.

 4 LPRA sec. 24r; Reglamento del Tribunal de Apelaciones de Puerto Rico, 4 LPRAAp. XXII-B.

 4 LPRA sec. 24s; Reglamento del Tribunal Supremo de Puerto Rico, 4 LPRA Ap. XXI-B.

 Rivera Soto v. J.C.A., 164 DPR 1, 7 (2005).

 íd.

 íd.

 Véase L.J. Torres Asencio, Carril expreso al Supremo, 80grados, 18 de mayo de 2012, (http://www.80grados.net/carril-expreso-al-supremo/# footnote—-10—11976) (última visita 5 de octubre de 2014).

 4 LPRA Ap. XXI-B, R. 23. Véase J.A. Cuevas Segarra, Tratado de derecho procesal civil, San Juan, Pubs. JTS, 2011, T. IV, págs. 1541-1543.

 El profesor Torres Asencio señala que “[e]n los últimos tres años, el Tribunal ha mostrado particular interés por certificar, y por ende, eximir del trámite adjudicativo ordinario, casos que involucran conflictos de índole político-partidista, y en casos en los que se cuestionaban actuaciones y/o políticas gubernamentales que generaron considerable polémica entre distintos sectores de la sociedad civil”. Torres Asencio, supra.

 E. Rivera Ramos y J. Farinacci Femós, Derecho constitucional, 80 (Núm. 3) Rev. Jur. UPR 603, 635 (2011).

 Véanse los votos particulares disidentes de la Juez Asociada Señora Rodríguez Rodríguez y la Jueza Asociada Oronoz Rodríguez en Rivera Schatz v. ELA et als., 191 DPR 448, 453-463 (2014). El Artículo 13 de la Ley de Colegiación Obligatoria dispone que “Ojos abogados que a la fecha en que entre en vigor esta Ley no estén colegiados deberán cumplir con dicho requisito en un término no mayor de noventa (90) días a contarse desde el lero de enero del próximo año natural posterior a la entrada en vigor de esta Ley”. A pesar de la claridad del texto legislativo, la mayoría paralizó los efectos de la ley.

 AMPR et als. v. Sist. Retiro Maestros V, 190 DPR 854 (2014). Hasta en el mismo Schneider [I], supra, pág. 543, “[n]ombramos un Comisionado Especial para recibir la prueba que las partes interesasen presentar”.

 Brau, Linares v. ELA et als., 190 DPR 315 (2014). Crespo v. Cintrón, 159 DPR 290, 298 (2003); E.L.A. v. Aguayo, 80 DPR 552, 595-597 (1958). Véase, además, R. Serrano Geyls, Derecho constitucional de Estados Unidos y Puerto Rico, San Juan, Col. Abo. P.R., 1986, Vol. I, pág. 195.

 E.L.A. v. Aguayo, supra.

 íd, pág. 596, citando Ashwander v. Tennessee, 297 US 288, 346 (1935). Vé *852 anse, además: International Ass’n of Machinists v. Street, 367 US 740, 749 (1961); Crowell v. Benson, 285 US 22, 62 (1932).

 ELA v. Aguayo, supra, citando a Parker v. Los Angeles, 338 US 327, 329 (1949); International Brotherhood v. Denver Milk Producers, 334 US 809 (1948); Rescue Army v. Municipal Court, 331 US 549, 575 (1946).

 Como discutiremos más adelante, a pesar de que la Opinión mayoritaria rechaza inicialmente los Artículos 5, 6 y 11 de la Ley de Colegiación, luego éstos son declarados inconstitucionales en virtud del poder inherente.

 Opinión mayoritaria, pág. 800.

 Art. I, Sec. 2, Const. ELA, LPRA, Tomo 1.

 In re Rodríguez Torres, 106 DPR 698, 709 (1978).

 Hernández Agosto v. Betancourt, 118 DPR 79, 86 (1986).

 In re Benítez Echevarría, 128 DPR 176, 176-177 (1991); In re Rivera Medina, 127 DPR 600 (1990); In re Concepción Velásquez, 126 DPR 474, 475 (1990); In *855 re Berríos Pagán, 126 DPR 458, 459 (1990); In re Delgado, 120 DPR 518, 527 (1988); In re Díaz Alonso, Jr., 115 DPR 755, 760 (1984); In re Bosch, 65 DPR 248, 251 (1945); Ex parte Jiménez, 55 DPR 54 (1939); In re Abella, 14 DPR 748, 751 (1908). Véase, además, G. Figueroa Prieto, Reglamentación de la conducta profesional en Puerto Rico: pasado, presente y futuro, 68 (Núm. 4) Rev. Jur. UPR 729, 769-771 (1999).

 In re Fund. Fac. Der. E. Ma. De Hostos II, 150 DPR 508, 512 (2000) (Resolución). Véanse, además: López Santiago, Ex parte, 147 DPR 909, 912 (1999); K-Mart Corp. v. Walgreens of P.R., Inc., 121 DPR 633 (1988); Schneider [I], supra; In re Liceaga, 82 DPR 252, 255 (1961).

 Boneta, Ex parte, 39 DPR 154 (1929).

 López Santiago, Ex parte, supra.

 In re Abella, supra.

 4 LPRA sec. 735.

 In re Tormes, 30 DPR 267 (1922).

 Esto es contrario a lo que asevera el Juez Asociado Rivera García en su Opinión de conformidad, pógs. 836-837.

 Además, argumentaron que no se les debía obligar a pertenecer al Colegio y que la exigencia de una cuota violaba su libertad de expresión y asociación. Finalmente, señalaron que las cuotas se utilizaban para propósitos ajenos a las responsabilidades del Colegio. Schneider [I], supra.

 Schneider [I], supra, pág. 546.

 nos jn(ijca ei profesor Figueroa Prieto que “[e]l propósito más evidente de la legislación de 2009 fue, no sólo eliminar la colegiación compulsoria y la participación del Colegio de Abogados en los asuntos relacionados con la disciplina de los abogados, sino castigar al Colegio de Abogados, silenciar su voz y cercenar [sus] finanzas”. G. Figueroa Prieto, Propuesta para la reglamentación de la conducta profesional en Puerto Rico, 81 Rev. Jur. UPR 1, 14 (2012).

 Véase, entre otras, In re Enmdas. Ley Col. Abogados, 177 DPR 819 (2010). Véanse, además: Ley Núm. 75 de 2 de julio de 1987 (4 LPRA see. 2021); Ley Núm. 108-2010 (4 LPRA see. 74); Ley Núm. 158-2011.

 Resolución de 17 de marzo de 2011, Col. de Abogados v. E.L.A., 181 DPR 135, 136 (2011).

 íd.

 “[...] tendría que explicarse el por qué, si el Tribunal Supremo había decidido en la litigación de Schneider que la colegiación compulsoria era lo mejor y lo másconveniente para nuestra jurisdicción, ahora de repente había dejado de serlo”. Figueroa Prieto, Propuesta para la reglamentación..., supra, pág. 18.

 Opinión mayoritaria, pág. 819.

 Inherente, según el diccionario de la Real Academia Española proviene del latín “inhaerens, —entis, part. act. de inhaergre, estar unido” y se define como aquello “[q]ue por su naturaleza está de tal manera unido a algo, que no se puede separar de ello”. Real Academia Española, Diccionario de la lengua española, 22da ed., http:// www.rae.es. En González v. Tribunal Superior, 75 DPR 585 (1953), se explicó que, según el Prof. Henry Rottschaefer, el concepto “inherente” sólo significa ser incluido o que necesariamente pertenece a algo.

 strategic Planning Committee of the State Bar of Wisconsin, Future of the State Bar Bar: Mandatory ¡Voluntary Membership Report, February, 2010.

 Degen v. United States, 517 US 820, 823 (1996) (“The extent of these [inherent] powers must be delimited with care, for there is a danger of overreaching when one branch of the Government, without benefit of cooperation or correction from the others, undertakes to define its own authority”).

 Schneider [I], supra, pág. 558 (opinión concurrente del Juez Asociado Señor Negrón García).

 Opinión mayoritaria, pág. 817.

 Ley de Colegiación Obligatoria, Art. 3(0).

 íd., Art. 4.
En el ejercicio de su facultad para recibir e investigar las quejas que se formulen respecto a la conducta profesional de los abogados, la Comisión de Ética u organismo designado por el Colegio gozará de las facultades necesarias para cumplir a cabalidad con los deberes y funciones aquí dispuestas. Adoptará un reglamento para poner en vigor estas disposiciones, estableciendo normas que garanticen el debido proceso de ley, que agilicen los procedimientos y propicien un proceso justo e imparcial para las partes involucradas. Entre las prerrogativas que tendrá dicho organismo, se incluyen: celebrar vistas, tomar juramentos, recibir declaraciones juradas, ordenar la producción de evidencia documental o electrónica, citar a testigos o peritos, hacer referidos a foros de mediación de conflictos.

 En primera instancia, la Opinión mayoritaria rechaza los Artículos 5, 6 y 11. Véase, pág. 29 de la Ponencia. Sin embargo, posteriormente y en ejercicio de su poder inherente los declara inconstitucionales. Véase, pág. 35.

 Opinión mayoritaria, pág. 808.

 Schneider [I], supra.

 Art. II, Sec. 6, Const. ELA, LPRA, Tomo 1, ed. 2008, pág. 294. La incorporación de esta disposición a nuestra Carta de Derechos respondió a la propuesta de la Escuela de Administración Pública de la Universidad de Puerto Rico. Escuela de Administración Pública de la Universidad de Puerto Rico, La nueva Constitución de Puerto Rico, Río Piedras, EDUPR, 1954, págs. 224-25. Ésta no generó mayores debates. Así, el insigne jurista José Trías Monge explica que las minorías no incluyeron propuestas particulares sobre este derecho. Véase J. Trías Monge, Historia Constitucional de Puerto Rico, Río Piedras, EDUPR, 1982, Vol. III, pág. 186. Como muy *868 bien reconoce la Opinión mayoritaria y el Voto de conformidad del Juez Asociado Señor Martínez Torres, es verdad irrebatible que la articulación textual de ese derecho se inspiró en el primer inciso del vigésimo artículo de la Declaración Universal de Derechos Humanos (cita del Art. 20(1) de la Declaración Universal de Derechos Humanos ["Ibda persona tiene derecho a la libertad de reunión y de asociación pacíficas”]). Sin embargo, es igualmente cierto que la incorporación textual del derecho en cuestión no incorporó la vertiente negativa del mismo, la cual sí fue explieitada en el segundo inciso del segundo artículo de la Declaración Universal de Derechos Humanos (“Nadie podrá ser obligado a pertenecer a una asociación”). Ello pudiera significar —sin que se interprete que favorecemos esta interpretación'—• que la intención de nuestros constituyentes no fue robustecer la vertiente negativa del derecho a la libre asociación, en la medida en que, pudiendo hacerlo, optaron por sólo incorporar su acepción positiva. Por lo tanto, resulta preocupante que la mayoría de este Tribunal •—especialmente el Juez Asociado Señor Martínez Torres— obvie la importancia de dicho proceder; máxime cuando en el pasado han suscrito un estricto análisis originalista al interpretar ciertas protecciones constitucionales. AAR, Ex parte, 187 DPR 835 (2013). De igual forma, habría que señalar que la mención de la Declaración Universal de Derechos Humanos, aunque oportuna en el caso y contexto que nos ocupa, es un tanto sorprendente, puesto que en otras ocasiones en que se han invocado derechos constitucionales que, de una forma u otra, provienen de dicho instrumento de Derecho Internacional Público —por ejemplo, el principio de la inviolabilidad de la dignidad humana o el discrimen por sexo—, la mayoría que hoy suscribe la Opinión de este Tribunal ha hecho caso omiso al mismo. AAR, Ex parte, supra.

 Schneider [I], supra, pág. 549 (“El derecho a la no asociación, derivable del derecho contrario consagrado en la Constitución del Estado Libre Asociado, Art. II, Sec. 6, cede ante los intereses señalados, de naturaleza claramente imperiosa bajo la constitución puertorriqueña”).

 Democratic Party v. Tribunal Electoral, 107 DPR 1, 25 (1978) ("Ni el derecho de asociación ni el de participar en actividades políticas es absoluto en ningún caso” (citando a Civil Service Commission v. Letter Carriers, 413 US 548, 567 (1973)).

 NAACP v. Alabama, 357 US 449, 460-61 (1958). Véanse, también: 5 Rotunda & Nowak, Treatise on Constitutional Law. Substance and Procedure Sec. 20.41(a) (5ta ed. 2013), págs. 403-404; R. Serrano Geyls, Derecho constitucional de Estados Unidos y Puerto Rico, San Juan, Ed. Col. Abo. P.R., 1988, Vol. II, pág. 1496.

 NAACP v. Alabama, supra.

 Abood v. Detroit Bd. of Edu., 431 US 209 (1977). Véase, también, Lathrop v. Donohue, 367 US 820 (1961).

 Schneider [I], supra, pág. 549.

 Schneider [2], sin embargo, se limita a evaluar lo atinente a la libertad de asociación. No obstante, poco después, en Colegio de Abogados v. Schneider [II], 117 DPR 504 (1986) (Schneider [II], este Tribunal atendió el asunto relativo a la libertad de asociación de los abogados y las abogadas disidentes. Para ello, confeccionó un complejo remedio que permitía que éstos objetaran oportunamente el uso de sus cuotas y, por tanto, que no se les vulnerara su derecho a la libertad de expresión al compelerlos a apoyar posturas adversas a sus ideas o concepciones personales. Véase Schneider [II], supra, págs. 513-515 y 522-529.

 Schneider [II], supra, pág. 514.

 Cabría tomar en cuenta las expresiones del Tribunal Supremo de Estados Unidos sobre este particular:
“But whatever the premises of opposition may be, only the most convincing justification under accepted standards of precedent could suffice to demonstrate that a later decision overruling the first was anything but a surrender to political pressure, and an unjustified repudiation of the principle on which the Court staked its *873 authority in the first instance. So to overrule under fire in the absence of the most compelling reason to reexamine a watershed decision would subvert the Court’s legitimacy beyond any serious question”. Planned Parenthood of Se. Pennsylvania v. Casey, 505 US 833, 867 (1992).

 H. Meléndez Juarbe, Un Tribunal a la defensiva, en Derecho al Derecho: intersticios y grietas del poder judicial (É. Fontánez Torres y H. Meléndez Juarbe, eds.), Cabo Rojo, Editora Educación Emergente, 2012, págs. 62-63.

 “Los enunciados generales de deber jurídico (normas o principios) constituyen la premisa mayor, la descripción de los hechos acaecidos constituyen la premisa menor y el contenido de la decisión individual del juez configura la conclusión”. M.C. Redondo Natella, La noción de razón para la acción en el análisis jurídico, Madrid, Centro de Estudios Constitucionales, 1996, pág. 118.